# EXHIBIT A – NOTICE OF SUPPLEMENTAL AUTHORITY

1    JAMES C. STURDEVANT (SBN 94551)
     (jsturdevant@sturdevantlaw.com)'
2    MONIQUE OLIVIER (SBN 190385)
     (molivier@sturdevantlaw.com)
3    WHITNEY HUSTON (SBN 234863)
     (whuston@sturdevantlaw.com)
4    THE STURDEVANT LAW FIRM
     A Professional Corporation
5    354 Pine Street, Fourth Floor
     San Francisco, California  94104
6    Telephone:    (415) 477-2410
     Facsimile:    (415) 477-2420
7
     MAEVE ELISE BROWN (SBN 137512)
8    (melisebrown@heraca.org)
     ELIZABETH S. LETCHER (SBN 172986)
9    (eletcher@heraca.org)
     NOAH ZINNER (SBN 247581)
10   (nzinner@heraca.org,)
     CYNTHIA SINGERMAN (SBN 244450)
11   (csingerman@heraca.org)
     HOUSING AND ECONOMIC RIGHTS ADVOCATES
12   1814 Franklin Street, Suite 1040
     Oakland, CA  94612
13   Telephone:    (510) 271-8443
     Facsimile:    (510) 868-4521
14
15   Attorneys for Plaintiffs and the Putative Plaintiff Class

16                  **UNITED STATES DISTRICT COURT**
                  **NORTHERN DISTRICT OF CALIFORNIA**
17                      **(SAN FRANCISCO DIVISION)**

18

19   HERMINIA MORALES et al,                  Case No.:   10-CV- 2068 JSW

20              Plaintiffs,                    CLASS ACTION

21                                             **NOTICE OF SUPPLEMENTAL**
                                               **RELEVANT AUTHORITY PURSUANT**
22              v.                             **TO LOCAL RULE 7-3(d)**

23   CHASE HOME FINANCE LLC, et al.,           Date of Motion:   September 17, 2010

24

25                                             Hon. Jeffrey S. White
                                               Complaint filed: May 14, 2010
26              Defendants.

27

28

The following supplemental authority in support of Plaintiffs' Opposition to Defendant's Motion to Dismiss is attached hereto:

1.      Memorandum in consolidated class actions *Beverly King, et al. v. CitiMortgage, Inc.*, United States District Court for the Central District of California Case No. CV 10-3792 DSF (PLAx), March 4, 2011, denying the defendant's Motion to Dismiss (Docket No. 70), attached hereto as Exhibit A.

2.      Consolidated Complaint in *Beverly King, et al. v. CitiMortgage, Inc.*, United States District Court for the Central District of California Case No. CV 10-3792 DSF (PLAx), filed November 8, 2011 (Docket No. 43), attached hereto as Exhibit B.

3.      Order in *Jackson v. OCWEN Loan Servicing,LLC*, No. 2:10-cv-00711-MCE-GGH, 2011 U.S. Dist. LEXIS 12816 (E.D. Cal. Feb. 8, 2011), attached hereto as Exhibit C.

4.      Order in *Darcy v. CitiFinancial, Inc. and CitiMortgage, Inc.*, United States District Court for the Western District of Michigan, Case No. 1:10-cv-848, filed Mar. 1, 2011 (Docket No. 39), attached hereto as Exhibit D.

5.      Plaintiff's Reply to Defendants' Response in Opposition to Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction in *Darcy v. CitiFinancial, Inc. and CitiMortgage, Inc.*, United States District Court for the Western District of Michigan, Case No. 1:10-cv-848, filed Feb. 23, 2011 (Docket No. 36), attached hereto as Exhibit E.

6.      Plaintiff's Brief in Support of Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction, in *Darcy v. CitiFinancial, Inc. and CitiMortgage, Inc.*, United States District Court for the Western District of Michigan, Case No. 1:10-cv-848, filed Feb. 7, 2011 (Docket No. 30), attached hereto as Exhibit F.

Dated:  March 8, 2011                HOUSING AND ECONOMIC RIGHTS ADVOCATES

                                     THE STURDEVANT LAW FIRM
                                     A Professional Corporation


                         By:    _____/s/_____
                                Elizabeth S. Letcher
                                Attorneys for Plaintiffs and the Putative Plaintiff Class

Exhibit A:   Memorandum in consolidated class actions *Beverly King, et al. v. CitiMortgage, Inc.,* United States District Court for the Central District of California Case No. CV 10-3792 DSF (PLAx), March 4, 2011

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

# MEMORANDUM

| Case No. | CV 10-3792 DSF (PLAx) | Date | 3/3/11 |
|---|---|---|---|

| Title | Beverly King, et al. v. CitiMortgage, Inc. |
|---|---|

| Present: The Honorable | DALE S. FISCHER, United States District Judge |
|---|---|

| Debra Plato | Not Present |
|---|---|
| Deputy Clerk | Court Reporter |
| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
| Not Present | Not Present |

**Proceedings:** (In Chambers) Order Denying Motion to Dismiss (Docket No. 46)

The Court deems this matter appropriate for decision without oral argument. <u>See</u> Fed. R. Civ. P. 78; Local Rule 7-15. The hearing set for March 7, 2011 is removed from the Court's calendar.

Defendant's arguments as to some of Plaintiffs' claims are simply wrong. As to the remaining claims, the arguments are not appropriate for a motion to dismiss.

The Motion is DENIED.

Exh. B:  Consolidated Complaint in *Beverly King, et al. v. CitiMortgage, Inc.*, United States District Court for the Central District of California Case No. CV 10-3792 DSF (PLAx), filed November 8, 2011 (Docket No. 43)

**MILBERG LLP**
JEFF S. WESTERMAN (SBN 94559)
jwesterman@milberg.com
SABRINA S. KIM (SBN 186242)
skim@milberg.com
ANDREW J. SOKOLOWSKI (SBN 226685)
Asokolowski@milberg.com
One California Plaza
300 S. Grand Avenue, Suite 3900
Los Angeles, CA 90071
Telephone: (213) 617-1200
Facsimile: (213) 617-1975

**MILBERG LLP**
ANDREI V. RADO
arado@milberg.com
One Pennsylvania Plaza, 49th Floor
New York, NY 10119
Telephone: (212) 594-5300
Facsimile: (212) 868-1229

*Interim Lead Counsel for Plaintiffs*
[Additional Counsel on Signature Page]

FILED
CLERK, U.S. DISTRICT COURT

NOV - 8 2010

CENTRAL DISTRICT OF CALIFORNIA
BY                          DEPUTY

RECEIVED
BUT
NOT FILED

NOV - 8 2010

CLERK, U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
BY                          DEPUTY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BEVERLY KING and NANCY GLENNON, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>CITIMORTGAGE, Inc., a member of CITIGROUP Inc.,<br><br>Defendant. | CASE NO. CV 10-03792 DSF (PLAx)<br><br>**CLASS ACTION**<br><br>CONSOLIDATED COMPLAINT FOR:<br><br>(1) Breach of Contract;<br>(2) Breach of Implied Covenant of Good Faith and Fair Dealing;<br>(3) Promissory Estoppel;<br>(4) Violation of California Civil Code § 1788 *et seq.*;<br>(5) Violation of California Civil Code § 1785.25(a);<br>(6) Violation of Florida Statute § 501.201 *et seq.*;<br>(7) Violation of California Business and Professions Code § 17500 *et seq.*; and<br>(8) Violation of California Business and Professions Code § 17200 *et seq.*<br><br>**DEMAND FOR JURY TRIAL** |

[Caption Continued on the Following Page]

ORIGINAL

| CONSOLIDATED CLASS ACTION COMPLAINT | | CASE NO.: CV 10-03792 DSF (PLAx) |
|---|---|---|
| DOCS\535125v4 | | |

| 1 | HANNA BERNARD, on behalf of herself and all other similarly situated, | ) | CASE NO. 10-6292 DSF (PLAx) |

1      HANNA BERNARD, on behalf of herself
     and all other similarly situated,     )    CASE NO. 10-6292 DSF (PLAx)

2

                 Plaintiff,      )

3

4        v.      )

5    CITIMORTGAGE, INC.,      )

                 Defendant.      )

6    MARIA BETANCOURT and PEDRO     )    CASE NO. 2:10-cv-7049
7    BETANCOURT, individually and on     )    DSF(PLAx)
     behalf of all others similarly situated,     )

8

9                  Plaintiffs,      )

10        v.      )

11    CITIMORTGAGE, INC., a New York     )
     corporation; CITIBANK, N.A., a national     )
12    banking association; CITIGROUP, INC., a     )
     Delaware corporation; and DOES 1-100,     )

13                  Defendants.      )

14    CARLA CHUI, MAURIZIO CERDINI,     )    CASE NO. CV 10-7385-DSF
     ELIZABETH DANIEL, on behalf of     )    (PLAx)
15    themselves and all others similarly     )
     situated,     )

16

17                  Plaintiffs,      )

18        v.      )

19    CITIMORTGAGE, INC.,     )

                 Defendant.      )

20

21

22

23

24

25

26

27

28

Plaintiffs Beverly King, Nancy Glennon, Hanna Bernard, Carla Chui, Maurizio Verdini, Elizabeth Daniel, Maria Betancourt, and Pedro Betancourt ("Plaintiffs"), individually and on behalf of all others similarly situated, allege the following upon personal knowledge as to their own acts, and upon information and belief as to all other matters.

## NATURE OF THE ACTION

1.     Plaintiffs bring this class action to challenge CitiMortgage's ("Defendant" or "Citi") false promises of affordable loan modifications and failure to comply with its obligations to permanently modify the loans at the end of the trial modification period. Contrary to Citi's express commitment to "helping our customers facing financial hardship remain in their homes" and "work[ing] with you to find the best option for you," Citi's delay, incompetence and obstruction in the modification process have left countless homeowners – not with lower monthly payments  – but actually worse off than they were before seeking a modification from Citi.   Citi's aggressive solicitations, misrepresentations, and misconduct violate its contractual obligations, undermine the very purpose of affordable loan modifications, and are illegal under California and Florida law.

2.     Plaintiffs represent thousands of financially distressed homeowners with mortgages owned and/or serviced by Citi.   As casualties of the global economic crisis following the mortgage industry meltdown, these homeowners already faced serious financial hardship, including unemployment and/or lost income, rendering them unable to sustain their current mortgage payments.

3.     Citi exacerbated the mortgage crisis and its reverberating negative effects for its borrowers. Citi aggressively and falsely advertised its commitment to help homeowners obtain affordable loan modifications, including those available under the federal Home Affordable Modification Program ("HAMP") – a government program designed to alleviate the foreclosure crisis by providing

| CONSOLIDATED CLASS ACTION COMPLAINT | - 1 - | CASE NO.: CV 10-03792 DSF (PLAx) |
|---|---|---|

DOCS\535125v4

affordable mortgage loan modifications and other foreclosure alternatives to eligible borrowers.[1]    However, after enticing borrowers to apply for loan modifications and obtaining basic eligibility information regarding their income and debts,  Citi consistently delayed, avoided, or otherwise failed at permanently modifying the loans, while racking up illegitimate fees and/or unpaid interest (often added to the principal of the loan) against those borrowers who could least afford them.

4.    Specifically, Citi informed Plaintiffs and Class members who applied for a modification that (a) they were prequalified for a loan modification, (b) they would be placed in a 90-day "trial period" during which they could make reduced payments, and (c) the trial modification would become permanent if, consistent with Citi's instructions, they made the reduced payments during the trial period and provided additional documentation to Citi.

5.    Plaintiffs and Class members fulfilled their end of the bargain, making timely reduced payments and providing documentation (in many cases more than once).  Despite their compliance, Citi flouted its obligation to permanently modify the loans at the end of the trial modification period.   Instead, Citi subjected Plaintiffs and Class members to trial periods extending far beyond the promised 90 days and in some cases over one year.   After more delay, Citi rejected their requests for a permanent modification and often neglected to inform borrowers that their applications were denied.

6.    Worse, Citi demanded thousands of dollars in balloon payments and previously undisclosed fees – immediately – which were almost certain to drive Plaintiffs into foreclosure.  In addition, some of the Plaintiffs discovered that Citi reported them as delinquent to credit reporting agencies, even those who were

---

[1] Having taken $45 billion from the United States government as part of the Troubled Assets Relief Program, 12 U.S.C. § 5211 *et seq.* ("TARP"), Citi was subject to mandatory inclusion in HAMP.

| CONSOLIDATED CLASS ACTION COMPLAINT | - 2 - | CASE NO.: CV 10-03792 DSF (PLAx) |
| --- | --- | --- |

DOCS\535125v4

1  current on payments when they began the trial period, and despite the fact they

2  made timely reduced payments consistent with Citi's modification instructions.

3     7.     Citi's failure to make permanent, affordable loan modifications in the

4  promised 90-day time frame was inevitable.  Despite aggressively marketing loan

5  modifications to its customers and touting its participation in HAMP, Citi did not

6  allocate the necessary resources to timely or accurately process modification

7  requests.  Citi failed to staff an adequate number of trained, supervised personnel

8  to process the volume of loan modification requests that came in.  Not surprisingly,

9  these poorly equipped personnel often 1) improperly denied modification requests,

10 2) placed borrowers in other "assistance" programs that did not modify the loan

11 terms to make payments more affordable but merely changed the payment

12 schedule with a looming balloon payment; and/or 3) offered worse terms than

13 those for which the borrowers actually qualified.

14    8.     Perversely, Citi's lack of preparedness, delay, and other misconduct in

15 the modification process served to profit Citi with increased fees, interest, principal

16 balances and servicing compensation, at the expense of Plaintiff and Class

17 members who were deprived of an opportunity to cure their delinquencies, pay

18 their loans, and/or save their homes and credit.  Furthermore, relying on Citi's false

19 promises of affordable loan modifications, borrowers lost out on other options to

20 their detriment, including immediate short sale or foreclosure, which would have

21 allowed them to preserve cash on hand and seek cheaper living arrangements such

22 as renting.  Refinancing options likewise disappeared because Citi's inaccurate and

23 misleading credit reporting damaged Plaintiffs' and Class members' credit.  All the

24 while, Plaintiffs and Class members struggled to continue paying Citi large sums

25 of cash, believing that Citi would process their loan modification requests in a

26 timely manner without adverse credit consequences.  Now, having waited months

27 for Citi to process their loan modification requests only to have them either

28

| CONSOLIDATED CLASS ACTION COMPLAINT | - 3 - | CASE NO.: CV 10-03792 DSF (PLAx) |

DOCS\535125v4

1 delayed or denied, Plaintiffs and Class members find themselves at risk of
2 foreclosure with depleted cash on hand, ruined credit, and few options for
3 alternative living arrangements.

4       9.    Borrowers who were denied permanent modifications through no fault
5 of their own should not find themselves in a worse position than when they applied
6 for a modification. But here, Citi's abject failure to honor its agreements, coupled
7 with its misrepresentations and omissions about how it implemented its
8 "Homeowner Assistance" program, left Plaintiffs and Class members financially
9 devastated.

10      10.    Plaintiffs bring this lawsuit against Citi on behalf of themselves and
11 all others similarly situated, alleging common law claims for breach of contract,
12 breach of the implied covenant of good faith and fair dealing, and promissory
13 estoppel. Plaintiffs also allege statutory violations under California Civil Code
14 section 1788 *et seq.* (the "Rosenthal Fair Debt Collection Practices Act" or
15 "Rosenthal Act"), California Civil Code section 1785.25(a) (the "Consumer Credit
16 Reporting Agencies Act" or "CCRAA"), Florida Statute sections 501.201 *et seq.*
17 (the "Florida Deceptive and Unfair Trade Practices Act" or "FDUTPA"), and
18 California Business and Professions Code sections 17200 *et seq.* and 17500 *et seq.*
19 (the "Unfair Competition Law" or "UCL" and the "False Advertising Law" or
20 "FAL").

21      11.    Plaintiffs seek declaratory and injunctive relief to stop Defendant
22 from their unfair and oppressive actions, as well as damages, restitution, and costs
23 of suit as may be appropriate.

24 **JURISDICTION AND VENUE**

25      12.    This Court has subject matter jurisdiction pursuant to 28 U.S.C.
26 § 1332(d) because there are at least 100 Class members in the proposed Class, the
27 combined claims of proposed Class members exceed $5,000,000 exclusive of
28

| CONSOLIDATED CLASS ACTION COMPLAINT | - 4 - | CASE NO.: CV 10-03792 DSF (PLAx) |
|---|---|---|

DOCS\535125v4

1  interest and costs, and there are numerous Class members who are citizens of states

2  other than Defendant's state of citizenship.

3      13.    This Court has personal jurisdiction over Defendant because a

4  substantial portion of the wrongdoing alleged in this Complaint took place in this

5  state. Citi is authorized to do business here, has sufficient minimum contacts with

6  this state, and otherwise intentionally avails itself of markets in this state through

7  the promotion, marketing, and servicing of loans in this state so as to render the

8  exercise of jurisdiction by this Court permissible under traditional notions of fair

9  play and substantial justice.

10      14.    Venue is proper pursuant to 28 U.S.C. § 1391(a) because: at least one

11  plaintiff resides here, Citi has hundreds if not thousands of customers in this

12  District, Defendant receives substantial fees and interest from borrowers who hold

13  loans here, and a substantial part of the events or omissions giving rise to the

14  claims asserted herein occurred in this District.

15                          **THE PARTIES**

16      15.    All Plaintiffs are over the age of 18 and have their mortgage loan

17  serviced by Citi.

18      16.    Plaintiffs Beverly King ("King") and Nancy Glennon ("Glennon") are

19  residents of Rancho Cucamonga, California, and jointly hold a mortgage for their

20  home in Rancho Cucamonga.

21      17.    Plaintiff Hanna Bernard ("Bernard") is a resident of South Lake

22  Tahoe, California.

23      18.    Plaintiffs Carla Chui ("Chui") and Maurizio Verdini ("Verdini") are

24  residents of Miami Shores, Florida, and jointly hold a mortgage for their home in

25  Miami Shores.

26      19.    Plaintiff Elizabeth Daniel ("Daniel") is a resident of Vero Beach,

27  Florida.

28

| CONSOLIDATED CLASS ACTION COMPLAINT | - 5 - | CASE NO.: CV 10-03792 DSF (PLAx) |
| --- | --- | --- |
| DOCS\535125v4 | | |

20. Plaintiffs Maria Betancourt and Pedro Betancourt (the "Betancourts") are residents of Napa County, California.

21. Defendant CitiMortgage, Inc. is headquartered in O'Fallon, Missouri, and is the fourth largest mortgage servicer in the country. Citi is part of Citigroup Inc., a global financial conglomerate based in New York City.

<strong><u>THE RESIDENTIAL MORTGAGE CRISIS</u></strong>

22. The collapse of the residential real estate market in 2007 and 2008 and the resulting recession led to an unprecedented foreclosure crisis in the United States.

23. In 2008, more than two million homes entered foreclosure proceedings. In 2009, an additional 2.8 million homeowners entered foreclosure. Experts estimate that the numbers will continue to grow and that the number of homes foreclosed in 2010 will be greater than in 2009.[2]

24. A Congressional Oversight Panel report noted that one in eight U.S. mortgages is currently in foreclosure or default, and each month approximately 250,000 additional foreclosures are initiated.[3]

25. A home is typically a family's most important asset and investment. The effects of foreclosure on a personal level are understandably devastating. Foreclosure damages credit, making it difficult for families to purchase another home or even rent another place to live.

---

[2] Office of the Special Inspector General for the Troubled Asset Relief Program, *Factors Affecting Implementation of the Home Affordable Modification Program*, March 25, 2010, at 1, *available at* http://www.sigtarp.gov/reports/audit/2010/Factors_Affecting_Implementation_of_t he_Home_Affordable_Modification_Program.pdf.

[3] Congressional Oversight Panel, Oct. 9, 2009 report at 3, *available at* http://cop.senate.gov/documents/cop-100909-report.pdf.

1       26.    The crippling effects of foreclosures extend beyond just the plight of

2   one household.  Communities also suffer from decreased property values and low

3   tax revenue.[4]

4   ## THE LOAN SERVICING INDUSTRY

5       27.    Despite the crippling and rippling effects of the mortgage crisis,

6   mortgage servicers like Citi have little incentive to modify loans, and instead have

7   every incentive to precipitate borrower default and ultimately foreclosure.

8       28.    Mortgage loans are generally originated with the intention of selling

9   them to investors.  Loans can be sold in whole on the secondary market, so that a

10  single investor owns the entire loan, or, more commonly today, securitized.  In

11  securitization, thousands of loans are pooled together in common ownership held

12  by a trust.  Bonds are issued to investors based on the combined, anticipated

13  payment streams of the pooled loans.  The bonds that are issued may be for

14  different categories of payments, such as interest payments, principal payments,

15  prepayment penalties or late payments.  The different groups of bond holders are

16  paid from different categories of money and in different orders.

17      29.    With the advent of securitization, a new industry of loan servicers has

18  emerged.  Loan servicers collect and process payments on mortgage loans,

19  maintain the records of payments, and are the entities through which any request

20  for a loan modification must pass.

21      30.    Loan servicers compete for the right to service pools of mortgages at

22  the time the mortgage pool is created.  Securitization agreements (also known as

23  pooling and servicing agreements or PSAs) generally identify a master servicer

24  who receives a portion of payments on a mortgage pool until the mortgage is paid

25  off.  The PSAs provide no meaningful restrictions on individual loan modifications

26

27  [4] *Id.* at 5

28

1  and, therefore, loan servicers generally have the ability to approve and analyze

2  loan modifications.

3       31.    Loan servicers derive their income from direct payments based on the

4  principal balance of the pool of loans. Servicers benefit from keeping principal

5  loan balances high, whether by capitalizing arrears and unpaid fees or by refusing

6  loan modifications with principal reductions.

7       32.    Loan servicers also derive income from fees imposed on borrowers

8  (such as late fees, foreclosure fees, inspection fees, and broker opinion fees which

9  PSAs allow servicers to collect directly from the borrower, or if the home is

10  foreclosed, directly from the top of foreclosure proceeds). These fees create a

11  profit center for large servicers.

12       33.    Servicers also derive interest income on the float between the time

13  when payments are received from borrowers and when they are passed on to the

14  investors, among other things. Servicers create interest income by stretching the

15  time to turn over funds – i.e., paying the taxes or insurance late or at the last

16  moment possible – to create more float income. Thus, prepayments of loans

17  increase the float income because there are then larger amounts of money sitting in

18  the float account, generating interest, until turned over to investors. Float interest

19  income thus gives servicers an incentive to favor any resolution that involves a

20  prepayment, such as a refinance, a sale of the home, or a foreclosure.

21       34.    Servicers also make additional income through affiliated businesses,

22  such as insurance companies, property valuation companies, and inspection

23  companies. Servicers contract with these affiliated businesses (which often

24  specialize in providing services for loans in default) for various services and the

25  costs are imposed on borrowers.

26       35.    Loan servicers who fail to modify loans face few consequences.

27  Although investors generally do not have an interest in foreclosure, large mortgage

28

---

pools may involve hundreds of investors with differing views about whether a foreclosure is appropriate. Further, investors may feel the financial pain of default differently because, as alleged above, different investors often own different parts of the security, i.e., principal payments, interest payments, or prepayment penalties and are paid in different order based on their assigned priority.

36. Even if an investor favors loan modification, investors do not have authority to directly control a loan servicer's actions. Investors generally can only take action through the trustee and only if a majority of the investors agree. Trustees can fire a servicer in rare cases, but this right is seldom invoked and then only when the servicer does not pay monthly payment advances on the loans.

37. Because of this lack of direct control, loan servicers have little incentive to aggressively pursue loan modifications, especially in light of the compensation scheme described above. First, maintaining borrowers in default and delaying decisions on loan modifications generate profits for loan servicers through late fees, inspection fees, and the like. Second, performing loan modifications is expensive. Third, putting borrowers in a position of refinancing or foreclosure can create additional float interest income and allow servicers to recoup advanced principal and interest payments. Fourth, imposing junk fees and capitalizing arrears can increase principal balances and servicing compensation. These facts actually favor foreclosures and short-term repayment plans, and gives context to Citi's misconduct.

## THE HOME AFFORDABLE MODIFICATION PROGRAM

38. On October 3, 2008, Congress passed the Emergency Economic Stabilization Act ("EESA") "to immediately provide authority and facilities that the Secretary of the Treasury can use to restore liquidity and stability to the financial system of the United States." 12 U.S.C. §§ 5201, *et seq.*

| CONSOLIDATED CLASS ACTION COMPLAINT | - 9 - | CASE NO.: CV 10-03792 DSF (PLAx) |
|---|---|---|

39. One of the main purposes of EESA is to "help families keep their homes and to stabilize communities." 12 U.S.C. § 5213. The EESA mandates that the Secretary "shall implement a plan that seeks to maximize assistance for homeowners and use the authority of the Secretary to encourage the servicers of the underlying mortgages, considering net present value to the taxpayer" to take advantage of "available programs to minimize foreclosures." 12 U.S.C. § 5219.

40. The EESA authorized the Secretary to establish the Troubled Asset Relief Program ("TARP") to purchase troubled assets from financial institutions. 12 U.S.C. § 5211. Congress allocated up to $700 billion to the Department of the Treasury for TARP. 12 U.S.C. § 5225.

41. In February 2009, the Department of the Treasury created the Making Home Affordable Program ("MHA") under its authority under the EESA. One of the major initiatives under the MHA is the Home Affordable Modification Program ("HAMP").[5]

42. The purpose of HAMP is to modify eligible mortgages to lower the monthly mortgage payments for homeowners in default or at risk of default.[6] HAMP sets forth a uniform structure for offering modified loans to qualifying borrowers.[7] The Obama Administration allocated $75 billion to HAMP, including $50 billion in TARP funds.[8]

---

[5] Office of the Special Inspector General for the Troubled Asset Relief Program, *Factors Affecting Implementation of the Home Affordable Modification Program*, March 25, 2010 ("SIGTARP Report"), at 1, *available at* http://www.sigtarp.gov/reports/audit/2010/Factors_Affecting_Implementation_of_t he_Home_Affordable_Modification_Program.pdf.

[6] *Id.*

[7] HAMP Supplemental Directive 9-01 ("SD 9-01") at 1. The HAMP "Program Documentation," which includes SD 9-01 and other supplemental instructions and directions to Servicers issued by the Treasury, Fannie Mae, and Freddie Mac is *available at* the HAMP Administrative Website for Servicers, https://www.hmpadmin.com/portal/index.jsp.

Specifically, the Handbook, 2009 Supplemental Directives, and 2010 Supplemental Directives, and archives are *available at*

43.     Participating mortgage servicers are largely responsible for executing HAMP. Servicers receive a $1,000 incentive from the federal government for each permanent modification they execute under HAMP.[9] This "incentive," however, is basically equivalent to the estimated cost to perform a single loan modification.

44.     The Federal National Mortgage Association ("Fannie Mae") and the Federal Loan Mortgage Corporation ("Freddie Mac") act as the government's Administrative Agent and Compliance Agent for HAMP.[10]

45.     Participating servicers enter into a Servicer Participation Agreement ("SPA") with the United States (through its agent, Fannie Mae). As of January 2010, 110 servicers, including Citi, have entered into an SPA to participate in HAMP.[11] A signed copy of the SPA between Paul R. Ince, Citi's Chief Financial Officer, and Fannie Mae, dated April 13, 2009 is *available at* http://www.financialstability.gov/docs/HAMP/CitiMortgage%20Servicer%20Participation%20Agreement.pdf.

46.     A servicer's duties and responsibilities under HAMP are set forth in the SPA. The SPA incorporates supplemental instructions and directions to Servicers issued by the Treasury, Fannie Mae, and Freddie Mac, referred to as

---

https://www.hmpadmin.com/portal/programs/guidance.jsp. HAMP checklists and NPV model documents are *available at* https://www.hmpadmin.com/portal/programs/servicer.jsp.

The FAQs are *available at* https://www.hmpadmin.com/portal/programs/servicer.jsp and https://www.hmpadmin.com/portal/programs/docs/hamp_servicer/hampconversion faqs.pdf.

[8] Office of the Special Inspector General for the Troubled Asset Relief Program, Quarterly Report to Congress, April 20, 2010 report at 8, *available at* http://www.sigtarp.gov/reports/congress/2010/April2010_Quarterly_Report_to_Congress.pdf.

[9] SD 09-01 at 22-25.

[10] SIGTARP Report, *supra* at 2.

[11] *Id.* at 10.

1   "Program Documentation."   Until recently, directions to servicers were issued
2   primarily in the form of "Supplemental Directives," regarding the servicer's duties.
3   Now, the HAMP rules are compiled in a "Handbook for Servicers of Non-GSE
4   Mortgages."   The Treasury also provides Frequently Asked Questions ("FAQ")
5   documents that clarify the Supplemental Directives for HAMP.[12]  Each servicer is
6   required to review these documents and the "frequently asked questions constitute
7   supplemental documentation that is included in, and shall be deemed part of, the
8   HAMP Program Documentation described in Section 1 of the SPA."[13]

9       47.   The SPA provides that the servicer *shall* perform the loan
10  modification and foreclosure prevention services described in the Program
11  Documentation.  SPA at ¶ 1A (emphasis in original).

12      48.   A homeowner is eligible for HAMP if she meets certain criteria.  The
13  borrower's mortgage must be delinquent or at risk of imminent default due to
14  changes in financial circumstances, such as unemployment.[14] [15]   The borrower
15  must have a monthly mortgage payment ratio of greater than 31 percent.   The
16  mortgage must have originated before January 1, 2009, be secured by a 1-4 unit
17  property (one of which is the borrower's principal residence), and fall within
18  HAMP's maximum unpaid principal balance requirements.[16]   The home may not
19  be investor-owned, vacant or condemned.   Borrowers in bankruptcy may be
20  considered for HAMP and borrowers engaged in litigation regarding their

---

[12] *See e.g.* Supplemental Documentation – Frequently Asked Questions, April 2, 2010 ("April FAQ").

[13] *Id.* at 1.

[14] Default is generally defined as being at least 60 days late on a mortgage payment.

[15] SD 9-01 at 2; *see also* SIGTARP Report, *supra* at 3.

[16] In other words, duplexes or condominiums containing more than one unit, but not to exceed four, also qualify for HAMP modification as long as one of the units is the borrower's principal residence.

---

| CONSOLIDATED CLASS ACTION COMPLAINT | - 12 - | CASE NO.: CV 10-03792 DSF (PLAx) |

DOCS\535125v4

mortgage also qualify.[17]   All borrowers must sign a Hardship Affidavit that describes their reason for applying for a HAMP modification.

49.   Pursuant to Supplemental Directive 09-01, "a borrower that is current or less than 60 days delinquent who contacts the servicer for a modification, and claims a hardship must be screened for imminent default."[18]

50.   If a borrower is determined to be at risk of imminent default or is 60 days or more delinquent and the mortgage meets the HAMP requirements discussed above, the servicer *must* evaluate the loan to determine whether it qualifies for modification.[19]

51.   First, the servicer must determine whether, by changing the interest rate, duration, or other terms of the loan in a particular sequence known as the "Standard Modification Waterfall," the borrower's total payment can be reduced to 31% of the borrower's monthly income.[20]   By going through these steps, the servicer arrives at proposed modification terms.

52.   Next, the servicer uses those terms to perform a "Net Present Value" ("NPV") test to determine whether the borrower's loan should be modified.[21]   The NPV test determines whether it is economically advantageous to modify the loan. Factors considered under the NPV include the value of the mortgage, the homeowner's credit score, the home's location, the loan's delinquency status, and the homeowner's debt to income ratio.[22]   The Treasury provided "Base Net Present

---

[17] SD 9-01 at 2; SIGTARP Report, *supra* at 4.

[18] SD 9-01 at 3-4.

[19] *Id.*; *see also* SPA at ¶ 1A.

[20] *Id.* at 8-10; HAMP Checklist at 6.

[21] *Id*; *see also* SPA at ¶ 1A.

[22] SIGTARP Report, *supra* at 4.

1  Value (NPV) Model Specifications" that servicers may use or customize (provided
2  that the servicer's test conforms to HAMP requirements).[23]

3      53.    Servicers *must* offer a HAMP modification if the homeowner has a
4  positive NPV, "which indicates that it is economically advantageous to modify the
5  loan; *i.e.*, the modification will cause less loss to the owner of the mortgage than
6  proceeding with foreclosure."[24]  If a borrower has a negative NPV, the servicer
7  may perform the modification at its discretion.  Regardless of whether a
8  modification is pursued, the servicer must maintain documentation.

9      54.    Once a borrower qualifies for loan modification, servicers must
10  perform a two-step process for HAMP modifications.  First, the servicer provides
11  the borrower with a Trial Period Plan ("TPP").[25]  The Trial Period Plan Agreement
12  or Notice outlines the terms of the trial period.[26]  The Trial Period Plan and Notice
13  promise that the servicer will permanently modify the loan if the borrower sends in
14  requested income documentation and makes timely trial period payments.[27]

15      55.    The effective date of the trial period is set forth in the TPP Agreement
16  or Notice.[28]  The borrower must be current under the terms of the TPP at the end of
17  the trial period to receive a permanent modification.  If the borrower makes all

---

18  [23] Home Affordable Modification Program Base Net Present Value (NPV) Model
19  Specifications.

20  [24] 09-02 at 4, 14-15; SIGTARP Report, *supra* at 4. *see also* NPV Model
    Specifications.

21  [25] At the inception of the program, the offer was in the form of a Trial Period Plan
22  Agreement which borrowers signed and returned to accept. After Supplemental
    Directive 09-07 was issued in October 2009, servicers were permitted to use either
23  the TPP Agreement or a simple TPP Notice which offered the trial modification,
    which the borrower accepted by making the first payment under the plan. After
24  March 2010, servicers were required to use only the TPP Notice SD-09-06. *See*
    SD-09-07, at 6-7, and Exs. C and D thereto.

25  [26] SD 9-01 at 14.

26  [27] *Id.* at 15, 17-18.

27  [28] *Id.*

28

| CONSOLIDATED CLASS ACTION COMPLAINT | - 14 - | CASE NO.: CV 10-03792 DSF (PLAx) |
| --- | --- | --- |

DOCS\535125v4

1   required trial period payments no later than 30 days from the date the final

2   payment is due, then he or she is current.[29]

3       56.     If the borrower has provided the necessary documentation, signed the

4   TPP Agreement (where applicable), and made all the TPP monthly payments, then

5   Step 2 of HAMP is triggered and the borrower receives a permanent

6   modification.[30]

7       57.     HAMP directives mandate specific protections for borrowers applying

8   for modification under the program.  Servicers may not proceed with foreclosure

9   until the borrower has been evaluated for the program, and borrowers are protected

10  against foreclosure during the application process and trial period.[31]  Servicers

11  cannot force borrowers to waive their legal rights, or demand certain fees from

12  them.[32]  Servicers are required to give borrowers information so they can engage in

13  informed decision-making.[33]  After January 1, 2010, servicers were required to

14  give borrowers written explanations for denying a modification.[34]

15      58.     Finally, servicers are required to report a "full file" status report to

16  credit reporting agencies while they evaluate borrowers for eligibility during the

17  TPP.  "If the borrower is current when they enter the trial period, the servicer

18  should report the borrower as current but on a modified payment . . . ."[35]

19      59.     HAMP rules and directives create explicit rules and rigorous timelines

20  for the HAMP modification program.  The servicer's timing in processing

21  _____

[29] *Id.*

22  [30] *Id.* at 18; *see also* April FAQ at 19.

23  [31] SD 09-01 at 14, 19; SD 10-02 at 4-7.

24  [32] SD 09-01 at 2, 22.

25  [33] SD 09-01 at 13.

26  [34] SD 09-07 at 7; SD 09-08 at 2-3.

27  [35] April FAQ at 20.

28

1  borrower requests and evaluating eligibility for a permanent modification is of the

2  essence. HAMP rules require that servicers evaluate the income documentation

3  submitted "upon receipt" – later clarified to within 30 days.[36] In all cases, HAMP

4  rules direct servicers to prepare the permanent HAMP modification agreement

5  early "to allow sufficient processing time for the modification to become effective

6  on the first day of the month following the final trial period month."[37]

7      60. HAMP rules demand that servicers "comply with HAMP

8  requirements" and "document the execution of loan evaluation, loan modification

9  and accounting processes."[38] Servicers "must have adequate staffing, resources,

10  and facilities for receiving and processing the HAMP documents and any requested

11  information that is submitted by borrowers. Servicers must also have procedures

12  and systems in place to be able to respond to inquiries and complaints about the

13  HAMP."[39] Servicers must retain documents and keep detailed records.[40]

14      **CITI'S PARTICIPATION IN HAMP**

15      61. Citi aggressively solicited its borrowers to apply for modifications.

16  under HAMP through various advertisements and representations, including

17  mailers such as the one attached hereto as Exhibit F.

18      62. Citi's website proclaims "Citi is committed to helping our customers

19  facing financial hardship remain in their homes," and states "[i]f you are facing

20  financial hardship, we will work with you to find the best option for you." Citi

21  heavily advertised its commitment to "Homeowner Assistance," assuring

22

---

23  [36] *Id.* at 5, 15 ("upon receipt"); SD 09-07 at 1 (after October 8, 2009, review within 30 days).

24  [37] SD 9-03.

25  [38] SD 9-01 at 25.

26  [39] *Id.* at 13.

27  [40] *Id.*

28

1 borrowers that Citi is committed to helping keep people in their homes, with
2 options available to lower monthly payments.

3      63.    Citi repeatedly touted its supposed intent and ability to help needy
4 homeowners. For example, under "Homeowner Assistance" and "Hardship
5 Assistance," the Citi website states:

6      Citi is committed to helping keep people in their homes. There are
7      many possible solutions to manage your mortgage payment, and the
8      most important step you can take is to reach out for help today. . . .
9      **Are you concerned about your ability to pay your bills? Help Is**
10      **Free!** . . . Many homeowners are having trouble with their mortgage
11      payments and you may have the option to modify or change certain
12      parts of your mortgage loan agreement. Sometimes altering the
13      interest rate, the term of the mortgage or even the mortgage product
14      may be able to help you manage your monthly payments. . . . . Citi
15      understands sometimes situations occur that make it difficult for you
16      to make your monthly mortgage payments. Our Workable Solutions
17      Program was specifically created to help our customers who are
18      experiencing these hardships. If you're facing foreclosure, you may
19      still be able to keep your home. This requires you to be proactive and
20      work with your lender or servicer, or a professional counselor.

21      64.    Citi's "Homeowner Assistance" publicity campaign, including its
22 participation in HAMP, prompted thousands of customers to contact Citi and apply
23 for loan modifications. Citi's advertising represents, explicitly and implicitly, that
24 Citi complies with HAMP requirements. Treasury Service Performance Reports
25 estimate that, since HAMP started, hundreds of thousands of Citi borrowers were
26 potentially eligible for loan modification.

27
28

| CONSOLIDATED CLASS ACTION COMPLAINT | - 17 - | CASE NO.: CV 10-03792 DSF (PLAx) |
| --- | --- | --- |
| DOCS\535125v4 | | |

65.     In reality, Citi's participation in HAMP and related modification efforts are categorical failures. As of August 31, 2010, Citi initiated only 150,568 HAMP trials.[41] As of that date, Citi had only 10,400 active trial modifications and made only 49,538 permanent loan modifications.

66.     These numbers reflect Citi's failure to process modifications in time or according to HAMP rules. Citi regularly extends the trial period far beyond the 90-day HAMP guideline, erroneously denies permanent loan modifications to qualified borrowers, inaccurately represents that borrowers will suffer no adverse credit consequences during the trial period, and even places some borrowers in incorrect programs that cannot result in permanent loan modifications.

67.     Citi also fails to employ an adequate number of properly-trained employees to handle the large volume of loan modification requests.[42] Citi hired personnel with minimal education and/or no prior mortgage-related experience and provided a token "training" program that did not prepare those employees for processing incoming loan modification requests in an accurate, timely manner.

68.     Homeowners have complained about Citi's lack of customer service and poor communication. For instance, customers complain that despite submitting all of the documentation that Citi requests for a loan modification, Citi claims that the documentation is missing and/or Citi claims it did not receive the documentation, and makes repeated demands for it. Many borrowers complain they cannot get through to Citi to initiate the loan modification process.

69.     Citi's slow processing of HAMP applications substantially extends the time period that a loan is considered delinquent, damaging the borrower's credit.

---

[41] Servicer Performance Report Through August, 2010, *available at* http://www.financialstability.gov/docs/Sept%20MHA%20Public%202010.pdf.

[42] *See* Rebecca Christie and Bradley Keoun, *Treasure May Begin Selling Citigroup Shares Today (Update1)*, April 26, 2010, *available at* www.bloomberg.com/apps/news?sid=aAnWrmkWn2Tk&pid=20601087.

70.     When borrowers apply for a modification, they are not adequately informed that their loans will be reported as delinquent even if they make timely modification payments. In its third quarter earnings report released on October 15, 2009, Citigroup stated that it "[c]ompleted more than 24,000 mortgage loan modifications during the quarter. In addition, at the end of the quarter, Citigroup had more than 63,000 loans in the trial modification period under the [HAMP]." The earnings report further stated (although this was not revealed to Class members) that "[l]oans in the trial modification period under the HAMP *continue to remain delinquent even if the reduced payments agreed to under the program are made by the borrower* . . . [t]he impact of the HAMP also contributed to the $2.0 billion sequential *increase in loans 90+ days past due* in the North America residential real estate lending business" (emphasis added). Citigroup's first mortgage delinquencies went from $10.2 billion in the second quarter of 2009 to $12.5 billion in the third quarter.

71.     Even if a borrower manages to start the TPP process and comply with its terms, Citi fails to convert TPP Agreements into permanent modifications and/or delays determining a customer's status for permanent modification. Class members' trial periods have extended far beyond the 90-day HAMP guideline – sometimes up to 180 days, 270 days or more. Only a small fraction of loan modification applicants complete their trial periods within the 90-day HAMP guideline.

72.     The consequences to the borrower are severe: the borrower's unpaid balance continues to rise because Citi adds the difference between the trial payment and regular payment to the arrearage. The higher balance makes it harder for the borrower to sell the home, complete a short sale, or repay the arrearage, whether through a repayment plan or Chapter 13 bankruptcy. The large arrearage

1  amount can make it more difficult for the borrower to qualify for a non-HAMP or

2  "traditional" loan modification.

3      73.  Whenever Citi denies a permanent modification and/or delays making

4  a decision, it nevertheless generates profits because it assesses a large amount of

5  fees for default management against its customers, such as late fees, inspection

6  fees and other fees.  For example, many customers are charged monthly property

7  inspection fees that are automatically scheduled, are forced to pay for forced

8  insurance from affiliated businesses, and/or are required to pay other unnecessary

9  and unreasonable "delinquency" expenses.

10     74.  In addition, without informing borrowers whether they have been

11 denied a permanent loan modification, Citi sends borrowers default letters

12 demanding thousands of dollars and threatening foreclosure.  Citi fails to inform

13 borrowers entering trial plans that thousands of dollars will suddenly become due

14 if their modification is denied.  Homeowners paying under trial plans are, by

15 definition, already facing financial hardship.  Citi's demand for the arrearage

16 amount effectively guarantees that the borrower will be unable to pay, or forces

17 them into short-term repayment plans to avoid foreclosure.

18     75.  The arrears Citi demands include several "junk fees," i.e.,

19 unnecessary, unreasonable foreclosure-related fees, including automatically-

20 imposed computerized inspection fees which are illegitimate given that borrowers

21 are making timely payments under the trial modification plans.

22     76.  Citi also reports incomplete and/or inaccurate information to credit

23 reporting agencies about borrowers who are under a TPP.  Citi reports consumer

24 loans as delinquent to credit reporting agencies even if trial payments are made on

25 time and even if a borrower was current at the time the borrower entered a TPP.

26 Under HAMP, if a borrower is current at the time he or she enters a TPP, Citi

27 should report the borrower as current but on a payment plan.  Similarly, if a

28

1  borrower is late at the time he or she enters a TPP, but current for the duration of
2  the TPP, Citi should report the borrower as delinquent for the duration the
3  borrower was delinquent, but report the borrower as current during the TPP but on
4  a payment plan. Instead, Citi has a uniform written policy of reporting borrowers
5  delinquent, even if they are current during the TPP. Citi fails to comply with
6  HAMP's credit reporting guidelines, despite its representations that its loan
7  modification programs comply with HAMP. Notwithstanding HAMP's
8  requirements, Citi's credit reporting policies result in incomplete and/or inaccurate
9  information being reported to credit reporting agencies.

10  77. By failing to convert TPP Agreements into permanent modifications
11  and/or failing to make any determination *at all* after a customer's completion of the
12  three-month (or longer) trial period, Citi generates profits at the expense of
13  borrowers who are left questioning whether their homes can be saved.

14  78. Citi's deficient implementation of the HAMP program increases its
15  own profits at the borrower's expense. A borrower's indebtedness increases, rather
16  than decreases. The likelihood of foreclosure also increases because many
17  borrowers cannot pay the massive arrearages created by Citi's delayed loan
18  modification process and the repeated assessment of fees to their accounts.

19  79. Citi's conduct also prevents borrowers from pursuing other courses of
20  action. For example, money that homeowners are putting towards their TPP
21  payments could be used instead to pursue bankruptcy, help them relocate, or
22  proceed with a short sale of their home. Citi's undisclosed policy of reporting TPP
23  payments as a rolling delinquency deprives borrowers of many alternative living
24  arrangements or, at the very least, makes them more costly. Citi's policies and
25  practices place borrowers in a worse position than if they had never applied for a
26  HAMP loan modification.

27
28

| CONSOLIDATED CLASS ACTION COMPLAINT | - 21 - | CASE NO.: CV 10-03792 DSF (PLAx) |
| DOCS\535125v4 | | |

## THE PLAINTIFFS' EXPERIENCE

### Plaintiffs King and Glennon

80.    In April 2009, in response to financial difficulties, Plaintiffs King and Glennon contacted Citi and inquired about a loan modification to reduce their $2,186.82 mortgage payment.

81.    King and Glennon submitted a hardship assistance package and complied with Citi's requests for additional – sometimes duplicate – documentation. King and Glennon continued to make timely loan payments.

82.    In July 2009, Defendant approved King and Glennon's request for repayment and required four $2,186.82 payments between July and October 2009.

83.    Beverly King called Citi to explain that the $2,186.82 repayment amount was not a reduced payment. Citi told King that this was an error and that Defendant would send a new letter reflecting a reduced payment schedule.

84.    In August 2009, Citi approved King and Glennon's reduced payment plan and required four payments of $1,094 between September and December 2009. The repayment schedule referenced a January 2010 payment of $11,401, but does not explain what that figure represents.

85.    King contacted Citi about the $11,401 January 2010 payment, and a Citi representative told her "don't worry" and that Citi would "extend" that payment in February 2010 if King and Glennon made all the other payments on time. Plaintiffs King and Glennon accepted this "modification" offer and made the requested payments starting in September 2009.

86.    King and Glennon timely submitted each of the modified payments as required under their agreement with Defendant.

87.    Despite complying with Defendant's instructions, in February 2010 Citi demanded $13,591, which included the $11,401 payment and late and delinquent fees – including $353.39 in late charges and $117 in delinquency expenses. Defendant told Plaintiffs that if they must make the enormous payment

1    immediately or face a short-sale of their home or foreclosure. Defendant did not

2    "extend" the massive balloon payment.

3    88.    On information and belief, Plaintiffs allege that despite King and

4    Glennon's repeated written requests to permanently modify their mortgage terms

5    to achieve an affordable payment, King and Glennon were placed in a "repayment

6    plan" that provided several months of reduced mortgage payments followed by a

7    $11,401 balloon payment in January 2010, and was designed to bring King and

8    Glennon current on their loan, rather than modifying their loan. Plaintiffs King

9    and Glennon did not request or want this option, and Citi did not inform them that

10   it imposed this option upon them.

11   89.    Defendant reported King and Glennon to credit reporting agencies as

12   late or in default, which destroyed their credit rating.

13   **Plaintiff Bernard**

14   90.    In August 2009, in response to financial difficulties, Plaintiff Bernard

15   contacted Citi to inquire about her eligibility for a HAMP loan modification.

16   91.    In August 2009, Citi determined that Bernard was eligible for a

17   HAMP loan modification. Citi informed Bernard that it would reduce her monthly

18   payment from $2,015.10 to $1,457.02 and instructed her to begin paying the

19   reduced amount immediately under a three-month TPP.

20   92.    Bernard made her first TPP payment in September 2009. Shortly

21   thereafter, she received an offer to enter into a three month HAMP TPP.

22   93.    The TPP offer letter states, "If you qualify under the federal

23   government's Home Affordable Modification program and comply with the terms

24   of this Trial Period Plan, we will modify your mortgage loan and you can avoid

25   foreclosure." The letter states that signing the TPP Agreement, returning it along

26   with certain verification documents, and providing the timely modified payment

27

28

constitutes acceptance of the offer. A copy of the TPP Agreement itself is attached as Exhibit A.

94. The TPP Agreement provided that Bernard should make three trial period payments of $1,457.02.

95. Bernard accepted the above offer by signing the TPP Agreement, sending in the first modified payment, and submitting the requested documents.

96. Bernard timely made both of her remaining TPP payments.

97. Despite Bernard's compliance with the terms of the TPP agreement, to date Bernard has not been offered a permanent HAMP loan modification. Citi has not informed her in writing whether her loan will be permanently modified.

98. Bernard contacted Citi repeatedly to inquire about the status of her modification. Citi instructed her to continue making monthly payments of $1,457.02. Bernard complied with these instructions.

99. In mid-December 2009, Citi began sending Bernard delinquency notices regarding her loan. Bernard contacted Citi regarding the notices. Citi instructed her to ignore the notices, and explained that she received them because Citi's computer records did not reflect her HAMP modification process.

100. In 2010, Bernard complied with Citi's requests for additional – sometimes duplicate – verification documents.

101. Despite complying with Defendant's instructions, in April 2010, Citi threatened to commence foreclosure proceedings if Bernard did not pay $13,766 within three weeks. This figure includes approximately $100 in monthly inspection fees, as well as a number of other unknown "delinquency related" fees.

102. Citi had no valid reason to repeatedly inspect the property. Bernard was current on her monthly payments and the initial inspection should have revealed that the property was occupied and in good condition.

103.   Bernard contacted Citi to complain that she had fulfilled all the terms of the TPP Agreement.  Citi informed her that it was investigating the matter, and would suspend all foreclosure proceedings while the investigation was pending, yet continued to send foreclosure threats to Bernard during the "investigation."

104.   In May 2010, with the threatened foreclosure date just days away, Citi advised Bernard that the only way to avoid foreclosure was to enter into a "repayment plan."  Under the repayment plan Bernard would pay $2,015.10 per month for five months and a $14,329.90 "balloon payment".

105.   Citi also demanded that Bernard pay for forced insurance and property taxes through Citi.  Bernard previously paid her taxes and insurance on her own for $5,286 per year.  Under Citi's new plan Bernard pays Citi $8,777.88 per year for forced insurance and taxes.

106.   After her ordeal with Citi, Bernard felt that entering the repayment plan was her only option and she entered the repayment plan.

107.   Despite Bernard's never missing a mortgage payment, Citi reported her loan as "delinquent" for months to consumer credit reporting agencies, causing her credit score to drop from 800 to 619.

108.   Bernard sacrificed time, money, and other alternatives to loan modification in complying with all of the terms in the TPP Agreement, in reliance on Citi's promises that compliance would result in a permanent HAMP loan modification.

**Plaintiffs Chui and Verdini**

109.   In April 2009, in response to financial difficulties, Plaintiffs Chui and Verdini contacted Citi to inquire about their eligibility for a HAMP loan modification.

110. In June 2009, Chui and Verdini received paperwork relating to their application for a HAMP loan modification, including an offer for them to enter into a three-month HAMP TPP.

111. The TPP offer letter states, "If you qualify under the federal government's Home Affordable Modification program and comply with the terms of this Trial Period Plan, we will modify your mortgage loan and you can avoid foreclosure." The letter further states that signing the TPP Agreement, returning it along with certain verification documents, and providing the timely modified payment will constitute acceptance of the offer. A copy of the TPP Agreement itself is attached as Exhibit B.

112. The TPP Agreement provided that Chui and Verdini should make three trial period payments of $2,064.33.

113. Chui and Verdini accepted the above offer in June 2009 by signing the TPP Agreement, sending in the first modified payment, and submitting the requested documents.

114. Chui and Verdini timely made both of their remaining TPP payments.

115. Despite their compliance in all respects with the terms of the TPP agreement, to date Chui and Verdini have not been offered a permanent loan modification under HAMP. Citi has not informed them in writing whether their loan will be permanently modified under HAMP.

116. Chui and Verdini contacted Citi repeatedly to inquire about the status of their modification. Citi instructed them to continue making monthly payments of $2,064.33. Chui and Verdini complied with these instructions.

117. Chui and Verdini complied with Citi's requests for additional – sometimes duplicate – verification documents.

118. In December 2009, Citi began sending Chui and Verdini delinquency notices regarding their loan. Chui and Verdini contacted Citi regarding the notices.

Citi never gave them consistent answers regarding why they received the notices. One time, they were told that they had too much equity on her house; another time they were told that Citi had seen that their house was for sale (which it was not).

119. In December 2009, Citi threatened to commence foreclosure proceedings on their home if Chui and Verdini did not pay $9,283.17 within one month. This figure includes approximately $45 in monthly inspection fees as well as a number of other unknown "delinquency related" fees. While a single inspection fee of $15 may be minor in an individual case, the combined revenue generated by these inspection fees is staggering.

120. Citi has no valid reason to repeatedly inspect the property. Chui and Verdini were current on their monthly payments and the initial inspection should have revealed that the property was occupied and in good condition.

121. In early February 2010, after borrowing money from Chui's father, Chui and Verdini called Citi to pay the $15,533 that Citi told them was now due. Citi told them that they had been sent directly to foreclosure. This phone call was the first time Chui and Verdini were told that Citi had initiated foreclosure proceedings.

122. Chui and Verdini explained to Citi that they had fulfilled all the terms of the TPP Agreement. Citi told them that their case was being handled by an outside attorney and refused to give Chui and Verdini any additional information regarding their HAMP loan or the foreclosure proceeding.

123. Chui and Verdini felt they had no choice but to immediately hire their own attorney in order to obtain reinstatement figures from Citi. After weeks of attempting to contact Citi and/or its attorney, Chui and Verdini finally received an email telling them that they needed to pay a reinstatement amount of $24,455.33. This amount included numerous property inspection fees, attorneys' fees, court fees, and a $750 mediation fee even though they had not gone to mediation.

124. Chui and Verdini paid the reinstatement amount. Several weeks after their payment, Citi dismissed its foreclosure complaint without prejudice.

125. Despite Chui and Verdini never missing a payment, Citi reported their loan as delinquent and "adverse" for months to consumer credit reporting agencies, causing their credit score to drop by 150 points.

126. Chui and Verdini sacrificed time and money complying with all of the terms in the TPP Agreement and fighting foreclosure, in reliance on Citi's promises that their compliance would result in a permanent HAMP loan modification.

**Plaintiff Daniel**

127. In July 2009, in response to financial difficulties, Plaintiff Daniel contacted Citi in July 2009 to inquire about her eligibility for a HAMP loan modification.

128. In September 2009, Ms. Daniel was offered a three-month TPP Agreement. Daniel accepted the offer by signing the TPP Agreement, sending in the first modified payment of $1,251.56, and submitting the requested verification documents.

129. Daniel timely made both of her remaining TPP payments.

130. Despite Daniel's compliance in all respects with the terms of the TPP agreement, Daniel has not been offered a permanent loan modification to date under HAMP. Citi has not informed her in writing whether her loan would be permanently modified under HAMP.

131. Daniel contacted Citi repeatedly to inquire about the status of her modification. Citi instructed her to continue making $1,251.56 monthly payments. Daniel complied with these instructions.

132. At some point in time, Citi began sending Daniel delinquency notices, which include the addition of unidentified fees, regarding her loan. Daniel

1  contacted Citi regarding the notices. Citi instructed her to ignore the notices and to

2  continue to make the monthly payments.

3  133. Daniel complied with Citi's requests for additional – sometimes

4  duplicate – verification documents.

5  134. In May 2010, without informing Daniel about the status of her HAMP

6  application, Citi sent Ms. Daniel a purported "Modification Agreement." The

7  Modification Agreement stated that Daniel's new principal balance was

8  $226,715.66. The amount included "arrearages" and is larger than Daniel's

9  original loan amount. It is unclear how Citi determined the Modification

10  Agreement's terms, and Citi refused to explain its calculations to Daniel. The

11  Modification Agreement gave Daniel until May 19, 2010 to accept the offer. A

12  copy of the Modification Agreement is attached as Exhibit C.

13  135. Under the Modification Agreement the monthly principal and interest

14  payment is $1,675.80 for the first two years, $1,820.62 for the third year, and

15  $1,911.27 thereafter. Daniel will also be charged an additional monthly escrow

16  payment amount, which may "adjust periodically" (initially $85.98 per month for

17  the first two years).

18  136. Daniel called Citi to inquire about the Modification Agreement and

19  was told that she could either (a) accept it and pay back interest, or (b) be placed in

20  default – implicitly threatening foreclosure. Consequently, Daniel believed

21  entering into the "Modified Agreement" was her only option.

22  137. Despite Daniel's never missing a payment on her mortgage loan, Citi

23  reported Daniel's loan as "partial" and "derogatory" for months to credit reporting

24  agencies, causing her credit score to drop from 650 to 590.

25  138. Daniel sacrificed time and money complying with all of the terms in

26  the TPP Agreement, in reliance on Citi's promises that her compliance would

27  result in a permanent HAMP loan modification.

28

CONSOLIDATED CLASS ACTION COMPLAINT  - 29 -  CASE NO.: CV 10-03792 DSF (PLAx)
DOCS\535125v4

**Plaintiffs Maria and Pedro Betancourt**

139.  In November 2008, in response to financial difficulties, Plaintiffs Maria and Pedro Betancourt contacted Citi to inquire about their eligibility for a HAMP loan modification.

140.  In June, 2009, Citi informed the Betancourts that they were approved for a HAMP trial plan, and sent them a Home Affordable Modification Trial Period Plan contract.  A copy of the TPP Agreement is attached as Exhibit E.

141.  The TPP Agreement provided that the Betancourts should make three trial period payments of $2,275.40.

142.  In July 2009, the Betancourts accepted the above offer by signing the TPP Agreement, timely making the first modified payment, and submitting the requested verification documents.

143.  The Betancourts timely made both of their remaining TPP payments.

144.  Despite the Betancourts' compliance in all respects with the terms of the TPP agreement, to date they have not been offered a permanent loan modification under HAMP.  Citi has not informed them in writing whether their loan will be permanently modified under HAMP.

145.  Citi did not offer the Betancourts a permanent modification at the end of the Trial Period.  Ms. Betancourt contacted Citi in October 2009 to inquire about the status of her modification, and a Citi representative told her to continue making trial period payments.  The Betancourts complied with these instructions.

146.  In January 2010, Citi informed the Betancourts that they were approved for a permanent modification and should receive documentation soon. Since the Betancourt had made seven monthly payments on what was supposed to be a three month trial period, Ms. Betancourt told the Citi representative that she was going to stop making payments and would wait until she received the final modification papers to make another payment.

147. The Betancourts complied with Citi's requests for additional – sometimes duplicate – verification documents.

148. In February 2010, a Citi representative notified the Betancourts that Citi could not locate the modification, and that it would be resent.

149. In March 2010, Citi sent the Betancourts a "Citi Affordable Modification." The cover letter demanded that the Betancourts sign and return the modification agreement "within 24–48hrs of receipt."

150. Although the "Citi Affordable Modification" agreement used a format similar to HAMP modification agreements, it is not a HAMP modification. It was fixed at 2% for the first two years, and then stepped up to 6.25% over the next 5 years. The term was extended to 34 years. A permanent modification under HAMP would have a lower interest rate for five years, then an increased rate every year until it fixed at the Freddie Mac Survey Rate at the date of the modification – in March 2010, around 5%.

151. In April 1, 2010, Citi sent the Betancourts a letter congratulating them for entering a trial plan, and two more copies of the June 2009 HAMP trial period plan contract that they had already executed and returned.

152. On April 12, 2010, a Citi representative who told Ms. Betancourt that the family did not qualify for a HAMP modification because their income was too high.

153. Despite their compliance in all respects with the terms of the TPP Agreement, the Betancourts were never offered a HAMP final modification – nor did they ever receive a letter stating the reason they had been denied a modification.

154. Citi has reported this account to at least one credit agency as "180 days past due" from April 2009 to May 2010.

## CLASS ALLEGATIONS

155.    Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure.  The "Class" is defined as follows:

(a)    All California and Florida residents with mortgage loans serviced by Citi and who, since April 13, 2009 through the final disposition of this and all related actions, (a) requested a mortgage loan modification from Citi, (b) made reduced and timely mortgage payments as instructed by Citi and complied with Citi's requests for documentation, (c) but who have not yet received a permanent modification, or have been notified by Citi that their request is denied.

(b)    All California and Florida residents with mortgage loans serviced by Citi who, since April 13, 2009 through the final disposition of this and all related actions, (a) requested a mortgage loan modification from Citi, (b) made reduced and timely mortgage payments as instructed by Citi and complied with Citi's requests for documentation, (c) but were charged for various foreclosure-related fees (the "Junk Fee Class").

(c)    All California and Florida residents with mortgage loans serviced by Citi who, since April 13, 2009 through the final disposition of this and all related actions, (a) requested a mortgage loan modification from Citi, (b) made reduced and timely mortgage payments as instructed by Citi and complied with Citi's requests for documentation, (c) but were reported to credit reporting agencies as delinquent during the Trial Period Plan ("Credit Reporting Class").

156.    Plaintiffs reserve the right to modify or amend the Class definition(s) before the Court determines whether certification is appropriate.

157.    Plaintiffs and Class members are so numerous that joinder of all members individually, in one action or otherwise, is impractical.

| CONSOLIDATED CLASS ACTION COMPLAINT | - 32 - | CASE NO.: CV 10-03792 DSF (PLAx) |
| DOCS\535125v4 | | |

158.    This action involves common questions of law and fact, including:

(a)    Whether Defendant breached its promises and contracts to permanently modify loans under HAMP and other loan modification or loss mitigation programs;

(b)    Whether Defendant breached the implied covenant of good faith and fair dealing inherent in those contracts;

(c)    Whether Defendant should be required under the doctrine of promissory estoppel to offer permanent modifications to Class members;

(d)    Whether Defendant breached Plaintiffs' deeds of trust;

(e)    Whether Defendants violated California Civil Code section 1788;

(f)    Whether Defendants violated California Civil Code section 1785.25(a);

(g)    Whether Defendants violated Florida Statute section 501.201;

(h)    Whether Defendant violated California Business and Professions Code Section 17500;

(i)    Whether Defendant violated California Business and Professions Code Section 17200;

(j)    Whether Plaintiffs are entitled to declaratory and injunctive relief; and

(k)    Whether Plaintiffs and Class members are entitled to damages, restitution, declaratory and/or injunctive relief as a result of Defendant's conduct; and, if so, the proper amount and nature of such relief.

159.    Plaintiffs understand and are willing to undertake the responsibilities of acting in a representative capacity on behalf of the proposed Class. Plaintiffs will fairly and adequately protect the interests of the Class and have no interests that directly conflict with the interests of the Class. Plaintiffs have retained

1 counsel experienced in complex class litigation, and will prosecute this action
2 vigorously.

3   160.  Plaintiffs' claims are typical of the claims of the Class because they
4 all have been deceived and damaged by Defendant's misconduct and breach.

5   161.  Judicial determination of the common legal and factual issues in this
6 case would be far more efficient and economical as a class action than individual
7 determinations.

8   162.  Plaintiffs know of no difficulty that will be encountered in the
9 management of this litigation that would preclude its maintenance as a class action.

10                                   **COUNT I**
                **Breach of Contract (TPP Agreements and Notices)**
11                      **(By All Plaintiffs Against Defendant)**

12   163.  Plaintiffs incorporate the above allegations by reference as though
13 fully set forth herein.

14   164.  Plaintiffs held mortgages serviced through Citi.

15   165.  Plaintiffs sought permanent loan modifications through Citi's
16 advertised loan modification programs, as described above.  Plaintiffs timely
17 provided all the necessary documentation requested by Citi in a timely manner in
18 order to participate in a modification program.

19   166.  Citi's trial modification agreements and/or notices offered Plaintiffs
20 and Class Members a permanent loan modification in return for making timely trial
21 period payments and complying with Citi's documentation requests.

22   167.  Plaintiffs agreed to Citi's offer and made timely reduced payments
23 consistent with Citi's instructions, and complied with all documentation requests,
24 or are excused from performance.

25   168.  Citi accepted Plaintiffs' modified reduced payments throughout the
26 trial period.

27

28

| CONSOLIDATED CLASS ACTION COMPLAINT | - 34 - | CASE NO.: CV 10-03792 DSF (PLAx) |

DOCS\535125v4

169. Plaintiffs' modified trial period payments as well as additional performance, including compliance with documentation requests, constitute consideration. By making those payments Plaintiffs also gave up their ability to pursue other alternatives to prevent default and foreclosure, and other alternative living arrangements.

170. Plaintiffs and Citi therefore formed valid contracts to modify their mortgage loans.

171. Citi breached the terms of the trial modification agreements. Citi systematically delayed and obstructed converting the trial modifications into permanent modifications by, among other things, demanding burdensome, duplicative documentation, failing to provide adequately trained loan modification staff and other failures described above.

172. Defendant has denied or failed to approve Plaintiffs for permanent modifications and instead demanded balloon payments, late and default fees, in violation of the modification contracts.

173. Plaintiffs remain ready, willing and able to perform under the loan modification contracts by continuing to make their modified reduced payments.

174. As a direct and proximate result of Defendant's breach of the loan modification agreements, Plaintiffs did not receive the benefit of their bargain, were damaged, and are threatened with additional harm, in an amount to be determined at trial.

**COUNT II**
**Breach of Contract (Deeds of Trust)**
**(By Plaintiffs Bernard, Daniel, Chui and Verdini**
**On Behalf of the Junk Fee Class Against Defendant)**

175. Plaintiffs incorporate the above allegations by reference as though fully set forth herein.

---

1     176.  Plaintiffs Bernard, Daniel, Chui and Verdini, and other Class

2    Members, have mortgage loans serviced by Citi and secured by Deeds of Trust (the

3    "Junk Fee Class").

4     177.  Plaintiffs and the Class members fully performed all conditions,

5    covenants and promises required of them under their respective Deeds of Trust and

6    as modified by Defendant in the TPP, including making timely mortgage payments

7    before entering into the TPP, and making timely modified TPP payments.

8     178.  After Plaintiffs were approved for a TPP, Defendant charged them

9    various fees, including, but not limited to, repeated "inspection fees."  On

10   information and belief, the work orders for Citi's inspection fees are computer-

11   generated requests which are assessed as a matter of course and do not provide any

12   meaningful information to Citi.

13     179.  The Deeds of Trust, however, only allow Citi to make "reasonable"

14   inspections of the property.

15     180.  Plaintiffs made timely monthly mortgage payments and occupied their

16   homes at all relevant times.  On information and belief, the initial inspection

17   revealed that Plaintiffs' properties were occupied and in good condition and

18   therefore, multiple inspections after the initial inspection were unreasonable.

19     181.  As such, Citi's multiple property inspections – and the associated fees

20   – breached the Deeds of Trust.

21     182.  As a proximate result of Citi's breach of the Deeds of Trust, the

22   Plaintiffs and Class members of the Junk Fee Class were damaged in an amount to

23   be proven at trial.

24                   **COUNT III**

**Breach of the Implied Covenant of Good Faith and Fair Dealing**

25               **(By All Plaintiffs Against Defendant)**

26     183.  Plaintiffs incorporate the above allegations by reference as though

27   fully set forth herein.

28

184. Every contract imposes upon each party a duty of good faith and fair dealing in its performance, which requires that neither party do anything to infringe upon the other party's rights to the benefits of the agreement, or to deprive the other party of the contract's benefits.

185. Citi breached the implied covenants of good faith and fair dealing contained its trial modification agreements and the deeds of trust which Citi services, as alleged above.

186. Citi also breached an implied contractual term requiring it to offer permanent modifications within a reasonable time following the 90-day trial modification period.

187. Citi breached the implied covenant by, among other things:

(a) failing to make good faith efforts to fulfill their contractual obligations, written and implied promises, and loan servicing functions;

(b) failing to make good faith efforts to provide Plaintiffs with a permanent loan modification;

(c) making false and/or misleading representations that Plaintiffs were eligible for the trial modification period, which would lead to a permanent loan modification;

(d) billing borrowers for unreasonable and unnecessary fees, including, but not limited to, inspection fees;

(e) failing to disclose that Plaintiffs modified reduced payments would be reported to credit bureaus as delinquent;

(f) delaying processing, demanding duplicate documentation, and failing to provide Plaintiffs with adequate information regarding loan modification programs;

(g) failing to provide enough adequately-trained personnel to ensure that loan modification applications were accurately or timely processed; and

(h) demanding exorbitant balloon payments, late fees, and delinquency fees from Plaintiffs that neither they, nor any other Class Member, could reasonably be in a position to pay.

188. As a direct result of Defendant's breaches of the implied covenant of good faith and fair dealing, Plaintiffs and Class Members were damaged, in an amount to be determined at trial.

## COUNT IV
### Promissory Estoppel
### (By All Plaintiffs Against Defendant)

189. Plaintiffs incorporate the above allegations by reference as though fully set forth herein.

190. Citi represented that Plaintiffs and Class Members were eligible for trial loan modifications and could immediately make modified payments that would satisfy existing loan obligations and lead to permanent loan modifications.

191. Citi intended to induce Plaintiffs and Class Members to rely on its representations regarding its loan modification programs and make modified payments.

192. Plaintiffs and Class Members did rely on Citi's representations about its loan modification programs and began making modified payments.

193. Plaintiffs' reliance was reasonable in light of Citi's representations regarding its loan modification programs.

194. Plaintiffs relied on Citi's misrepresentations to their detriment. Citi reported Plaintiffs to credit agencies as delinquent for paying the modified amount that Citi asked them to pay, damaging their credit. Citi unreasonably demanded Plaintiffs make large balloon payments they afford. Citi also refused to permanently modify Plaintiffs' loans, and Plaintiffs have lost the opportunity to seek alternatives to prevent the default and avoid foreclosure.

195. Citi also breached an implied contractual term by failing to offer permanent modifications within a reasonable time following the 90-day trial modification period.

**COUNT V**
**Violation of Civ. Code § 1788 *et seq.***
**(By Plaintiffs King, Glennon, Bernard and the Betancourts**
**Against Defendant)**

196. Plaintiffs incorporate the above allegations by reference as though fully set forth herein.

197. Citi is a "debt collector" within the meaning of Cal. Civil Code § 1788.2(c). The monies allegedly owed by the members of the proposed classes are "debts" within the meaning of Cal. Civil Code § 1788.2(d).

198. California's Rosenthal Fair Debt Collection Practices Act, Cal. Civ. Code § 1788 *et seq.* ("Rosenthal Act"), incorporates by reference, and requires compliance with, the provisions of the federal Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et. seq.* Cal. Civ. Code § 1788.17.

199. Citi violated these laws through various acts and practice including, but not limited to:

      (a)   using false, deceptive, or misleading representations or means in connection with the collection of any debt, 15 U.S.C. § 1692e;

      (b)   using false representations or deceptive means to collect or attempt to collect on any debt, 15 U.S.C. § 1692e(10); and

      (c)   using unfair or unconscionable means to collect or attempt to collect any debt, 15 U.S.C. § 1692f.

200. Under California Civil Code §§ 1788.30 and 1788.17, Plaintiffs and Class Members are entitled to recover actual damages sustained as a result of Citi's Rosenthal Act violations, in an amount to be proven at trial.

201. Under California Civil Code §§ 1788.30 and 1788.17, Plaintiffs and Class Members are entitled to recover attorney's fees, costs, and expenses.

**COUNT VI**
**Violation of Cal. Civ. Code § 1785.25(a)**
**(By Plaintiff Bernard On Behalf of the Credit Reporting Class Against Defendant)**

202. Plaintiffs incorporate the above allegations by reference as though fully set forth herein.

203. The Consumer Credit Reporting Agencies Act ("CCRAA") prohibits persons from furnishing information on specific transactions "to any consumer credit reporting agency if the person knows or should know the information is incomplete or inaccurate."

204. Citi's standard policy and practice during trial periods is to "report [consumer loans] as delinquent to the credit reporting agencies" even if trial payments are made on time and even if a borrower was current at the time the borrower entered a trial payment plan.

205. Plaintiff and Class Members were current on their mortgage payments when they entered a TPP and made timely modified mortgage payments during the TPP. Citi should have reported those accounts to credit reporting agencies as current, but on a modified payment plan.

206. Citi, however, reported Plaintiff's reduced mortgage payments as delinquent to credit reporting agencies without indicating that her payments were timely a modified payment plan.

207. In doing so, Citi furnished information it knew or should have known was incomplete or inaccurate to credit reporting agencies in violation of Civil Code § 1785.25(a).

208. Plaintiff and Class Members who were current when they entered trial modifications suffered actual injury, including, but not limited to, damage to their credit scores, a loss of available credit, and increased cost of credit.

1    209.  Plaintiffs and Class members seek to recover actual damages in an
2  amount to be determined at trial, injunctive and equitable relief, the costs of the
3  action and attorneys' fees under Civil Code § 1785.31.

4                                **COUNT VII**
                **For Violation of Florida Statute §§ 501.201 *et seq.*
5      **(By Plaintiffs Chui, Verdini and Daniel Against Defendant)**

6    210.  Plaintiffs incorporate the above allegations by reference as though
7  fully set forth herein.

8    211.  The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"),
9  Fla. Stat. §§ 501.201 *et seq.*, prohibits deceptive and unfair trade practices.

10   212.  Citi's acts and practices, alleged herein, constitute unfair and
11  deceptive trade practices under the FDUTPA.

12   213.  Citi's conduct is unfair and deceptive because it is contrary to its own
13  representations that it complies with HAMP requirements.

14   214.  Citi's conduct is unfair because it offends established public policy
15  and is immoral unethical, oppressive, unscrupulous, and substantially injurious to
16  consumers.

17   215.  Citi's conduct is deceptive because it is likely to mislead consumers.
18  For example, the TPP Agreement misleads borrowers into thinking that making
19  timely modified payments during the trial period will result in a permanent loan
20  modification.

21   216.  Citi's unfair and deceptive trade practices include the following:

22      (a)    representing that Plaintiffs and Class Members were applying
23  for and being evaluated for HAMP modifications consistent with HAMP
24  requirements, and failing to comply with HAMP requirements;

25      (b)    making false and misleading representations that trial
26  modification periods would lead to permanent modifications if Plaintiffs and Class

27

28

| CONSOLIDATED CLASS ACTION COMPLAINT | - 41 - | CASE NO.: CV 10-03792 DSF (PLAx) |

DOCS\535125v4

Members made timely modified payment and complied with documentation requests;

(c)    failing to determine it Plaintiffs and Class Members are eligible for HAMP before putting them into HAMP TPPs;

(d)    failing to timely determine qualification for permanent HAMP modification upon receipt of a borrower's first TPP payment and verification documents or before the end of the three-month trial period;

(e)    failing to provide Plaintiffs with adequate information regarding its loan modification programs;

(f)    delaying HAMP trial periods and determinations of whether Plaintiffs and Class Member in trial modifications qualified for permanent modifications by, among other things, (i) requesting unnecessary and/or duplicative verification documents; (ii) slowing and obstructing the underwriting process; and (iii) allocating insufficient adequately-trained personnel to process loan modification requests.

(g)    failing to inform Plaintiffs and Class Members that any trial modification period is virtually certain to last longer than 90 days;

(h)    failing to promptly communicate to Plaintiffs and Class Members that they are not eligible for permanent HAMP modifications;

(i)    failing to inform Plaintiffs and Class Members that they do not qualify for HAMP modification, then offering them deceptive and less favorable "Citi Affordable Modifications";

(j)    failing to waive all late fees for borrowers who comply with all terms of HAMP TPPs;

(k)    charging unreasonable and unconscionable fees, including repeated inspection fees even though property inspections are unnecessary after the initial inspection;

1  (l)  reporting loan payments to consumer credit agencies as

2  delinquent for borrowers who do not miss any loan payments and comply with the

3  terms of their TPP agreements;

4  (m)  failing to disclose to Plaintiffs and Class Members that if they

5  are denied a permanent modification, Citi would demand immediate and sizeable

6  balloon payments, plus late fees and other delinquency related fees;

7  (n)  failing to disclose to borrowers before, during and after the loan

8  modification process the type, nature and amount of fees and expenses being

9  assessed to their accounts.

10  217.  As a result of Citi's conduct, Plaintiffs and Class Members have been

11  aggrieved.  Under Fla. Stat. § 501.211(1), Plaintiffs seeks declaratory and

12  injunctive relief.

13  218.  As a result of Citi's conduct, Plaintiffs Chui and Verdini and other

14  Class Members suffered actual damages, calculated as the sum of all inspection

15  fees after the initial inspection fee.

16  219.  Plaintiffs and Class Members are entitled to declaratory relief,

17  injunctive relief, costs and attorneys' fees.  In addition, Plaintiffs Chui and Verdini,

18  Daniel, and Junk Fee Class members are entitled to damages.  Fla. Stat.

19  §§ 501.211(1) and (2), 501.2105.

20  **COUNT VII**

21  **Violation of California Business and Professions Code Section 17500 *et seq.***
   **(By Plaintiffs King, Glennon, Bernard, and the Betancourts**

22  **Against Defendant)**

23  220.  Plaintiffs incorporate the above allegations by reference as though

24  fully set forth herein.

25  221.  Throughout the Class Period, Citi engaged in a mass advertising and

26  marketing campaign regarding its participation in HAMP and other loan

27  modification and hardship assistance programs, its commitment to helping

28

customers prevent mortgage default and foreclosure through loan modifications, and boasted about its success in helping customers under HAMP and other loan modification programs on a nationwide basis, including in California.

222.  Citi engaged in its advertising and marketing with intent to directly or indirectly solicit customers to inquire about HAMP and other loan modification programs.  By advertising and representing that it was participating in HAMP, Citi implicitly represented its compliance with HAMP's well-publicized rules on loan modification processing and underwriting.

223.  Citi's advertising and representations were made on its website at www.Citi.com and through written materials sent to borrowers, such as the TPP Agreements and Notices, attached hereto as Exhibits A-E.

224.  Citi failed to disclose material information to borrowers, such as the risks of entering a HAMP trial modification period with Citi.  Specifically, Citi failed to disclose that:

(a)  Citi failed adequately to screen Plaintiffs and Class Members for eligibility before placing them in trial modifications, and they might not receive permanent loan modifications;

(b)  the purported "trial" period could and likely would last for far longer than three months because Citi lacked adequate resources to timely process modification requests;

(c)  Citi could deny a modification and terminate the trial modification at any point, and immediately demand a sizeable balloon payment, plus late and delinquency fees;

(d)  Citi would report modified payments of Plaintiffs and Class Members who were current when they entered a trial modification as late or in default to credit bureaus; and

1        (e)    Citi would charge borrowers numerous fees, such as late fees

2  and inspection fees.

3        225.   Contrary to Citi's advertising, the most common result of attempting

4  to modify a loan with Citi was that borrowers would be left in a worse position

5  than before.

6        226.   Citi's advertisements and marketing representations are false,

7  misleading, and likely to deceive the public and/or deceived the public because

8  they falsely represented the nature of Defendant's trial modification programs

9  and/or their benefits, and concealed material information about risks, as described

10  above.

11        227.   In making and disseminating the alleged advertising, Citi knew or

12  should have known that the statements were untrue or misleading, in violation of

13  California Business and Professions Code Section 17500, *et seq.*

14        228.   As a result of Defendant's conduct, Plaintiffs and Class Members

15  suffered injury in fact and lost money and/or property, including damage to their

16  credit, additional debt, late fees and delinquency expenses.  Plaintiffs and Class

17  Members would not have inquired about or entered the trial modification period, or

18  made modified payments as represented to them under it, had they been aware of

19  the false, misleading and incomplete nature of Citi's representations about its loan

20  modification programs.

21        229.   Plaintiffs and Class Members seek restitution, declaratory and

22  injunctive relief, and other relief permitted under Section 17535.

23  **COUNT VIII**<br>**Violation of California Business and Professions Code Section 17200 *et seq.***

24  **(By Plaintiffs King, Glennon, Bernard, and the Betancourts**<br>**Against Defendant)**

25

26        230.   Plaintiffs incorporate the above allegations by reference as though

27  fully set forth herein.

28

1    231. By engaging in conduct described above, Citi committed one or more

2 acts of "unfair competition" within the meaning of Business & Professions Code

3 Section 17200.

4    232. Citi committed "unlawful" business acts or practices by, among other

5 things, (a) engaging in false advertising in violation of Business and Professions

6 Code Section 17500, (b) violating California Civil Code section 1788, (c) violating

7 California Civil Code section 1785.25(a), (d) violating Florida Statute § 501.201,

8 (e) systematically breaching the trial modification contracts and agreements with

9 Plaintiffs and Class Members, (f) systematically breaching contractual limitations

10 on permissible fees in Plaintiffs' and Class Members' deeds of trust, (g)

11 systematically breaching the implied covenant of good faith and fair dealing,

12 and/or (h) inducing Plaintiffs and Class Members to rely on Citi's promises to their

13 detriment.

14    233. Citi committed "unfair" business acts or practices by, among other

15 things:

16    (a) engaging in conduct where the utility of such conduct, if any, is

17 outweighed by the gravity of the consequences to Plaintiffs and Class Members;

18    (b) engaging in conduct that is immoral, unethical, oppressive,

19 unscrupulous, or substantially injurious to Plaintiffs and Class Members; and

20    (c) engaging in conduct that undermines or violates the spirit or

21 intent of the consumer protection laws alleged in this Complaint.

22    234. Citi committed "fraudulent" business acts or practices by, among

23 other things, engaging in conduct Citi knew or should have known was likely to

24 and did deceive the public, including Plaintiffs and Class Members.

25    235. As detailed above, Citi's unlawful, unfair and fraudulent practices

26 include, but are not limited to, the following:

27

28

| CONSOLIDATED CLASS ACTION COMPLAINT | - 46 - | CASE NO.: CV 10-03792 DSF (PLAx) |
| --- | --- | --- |

DOCS\535125v4

1        (a)    representing that Plaintiffs and Class Members were applying

2  for and being evaluated for HAMP modifications consistent with HAMP

3  requirements, and failing to comply with HAMP requirements;

4        (b)    making false and misleading representations that trial

5  modification periods would lead to permanent modifications if Plaintiffs and Class

6  Members made timely modified payment and complied with documentation

7  requests;

8        (c)    failing to determine it Plaintiffs and Class Members are eligible

9  for HAMP before putting them into HAMP TPPs;

10       (d)    failing to timely determine qualification for permanent HAMP

11  modification upon receipt of a borrower's first TPP payment and verification

12  documents or before the end of the three-month trial period;

13       (e)    failing to provide Plaintiffs with adequate information

14  regarding its loan modification programs;

15       (f)    delaying HAMP trial periods and determinations of whether

16  Plaintiffs and Class Member in trial modifications qualified for permanent

17  modifications by, among other things, (i) requesting unnecessary and/or

18  duplicative verification documents; (ii) slowing and obstructing the underwriting

19  process; and (iii) allocating insufficient adequately-trained personnel to process

20  loan modification requests.

21       (g)    failing to inform Plaintiffs and Class Members that any trial

22  modification period is virtually certain to last longer than 90 days;

23       (h)    failing to promptly communicate to Plaintiffs and Class

24  Members that they are not eligible for permanent HAMP modifications;

25       (i)    failing to inform Plaintiffs and Class Members that they do not

26  qualify for HAMP modification, then offering them deceptive and less favorable

27  "Citi Affordable Modifications";

28

1           (j)    failing to waive all late fees for borrowers who comply with all

2  terms of HAMP TPPs;

3           (k)    charging unreasonable repeat inspection fees even though

4  property inspections are unnecessary after the initial inspection;

5           (l)    reporting loan payments to consumer credit agencies as

6  delinquent for borrowers who do not miss any loan payments and comply with the

7  terms of their TPP agreements;

8           (m)    failing to disclose to Plaintiffs and Class Members that if they

9  are denied a permanent modification, Citi would demand immediate and sizeable

10  balloon payments, plus late fees and other delinquency related fees;

11           (n)    failing to disclose to borrowers before, during and after the loan

12  modification process the type, nature and amount of fees and expenses being

13  assessed to their accounts.

14      236.  As a result of Defendant's conduct, Plaintiffs and Class Members

15  suffered injury in fact and lost money and/or property, including damage to their

16  credit, additional debt, late fees and delinquency expenses. Plaintiffs and Class

17  Members would not have inquired about or entered the trial modification period, or

18  made modified payments as represented to them under it, had they been aware of

19  the false, misleading and incomplete nature of Citi's representations about its loan

20  modification programs.

21      237.  Plaintiffs and Class Members seek restitution, declaratory and

22  injunctive relief, and other relief permitted under Section 17203.

23                    **PRAYER FOR RELIEF**

24      WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly

25  situated pray for judgment against Defendant as follows:

26      A.    An order certifying this case as a class action and appointing Plaintiffs

27  and their counsel to represent the Class members;

28

| CONSOLIDATED CLASS ACTION COMPLAINT | - 48 - | CASE NO.: CV 10-03792 DSF (PLAx) |
|---|---|---|
| DOCS\535125v4 | | |

1      B.    Restitution to Plaintiffs and Class members;

2      C.    Actual damages for injuries suffered by Plaintiffs and Class members;

3      D.    An order declaring Citi's alleged acts and practices to constitute a

4 breach of contract and a breach of the covenant of good faith and fair dealing;

5      E.    An order declaring that Citi is required under the doctrine of

6 promissory estoppel to offer permanent modifications to Plaintiffs and Class

7 members on the terms promised in their trial period modifications;

8      F.    A permanent or final injunction enjoining Citi's agents and

9 employees, affiliates and subsidiaries, from continuing to harm Plaintiffs and the

10 Class;

11      G.    An order requiring Citi to adopt and enforce a policy that provides

12 appropriate training of its employees and agents regarding their duties under loan

13 modification and other hardship assistance programs;

14      H.    An order for Citi's specific performance of its contractual obligations

15 together with other relief required by contract and law;

16      I.    Reasonable attorneys' fees and the costs of this action;

17      J.    Statutory pre-judgment interest; and

18      K.    Such other relief as this Court may deem just and proper.

19           **DEMAND FOR JURY TRIAL**

20      Plaintiffs hereby demand trial of their claims by jury to the extent authorized

21 by law.

22 DATED: November 8, 2010      **MILBERG LLP**
                        JEFF S. WESTERMAN

23                        SABRINA S. KIM

24

25                        SABRINA S. KIM

26

27

28

One California Plaza
300 S. Grand Avenue, Suite 3900
Los Angeles, CA 90071
Telephone: (213) 617-1200
Facsimile: (213) 617-1975
Email: jwesterman@milberg.com

**MILBERG LLP**
ANDREI V. RADO
arado@milberg.com
JESSICA J. SLEATER
jsleater@milberg.com
One Pennsylvania Plaza, 49th Floor
New York, NY 10119
Telephone: (212) 594-5300
Facsimile: (212) 868-1229

*Counsel for Plaintiffs*
*Beverly King and Nancy Glennon*

**FINKELSTEIN THOMPSON LLP**
ROSEMARY M. RIVAS
TRACY TIEN
100 Bush Street, Suite 1450
San Francisco, CA 94104
Telephone: (415) 398-8700
Facsimile: (415) 398-8704
Email:
rrivas@finkelsteinthompson.com
ttien@finkelsteinthompson.com

**PHILLIPS & GARCIA, P.C.**
ANDREW J. GARCIA
CARLIN J. PHILLIPS
13 Ventura Drive
Dartmouth, MA 02747
Telephone: (508) 998-0800
Facsimile: (508) 998-0919

*Counsel for Plaintiffs Hanna*
*Bernard, Carla Chui, Maurizio*
*Verdini, and Elizabeth Daniel*

**THE STURDEVANT LAW FIRM**
JAMES C. STURDEVANT
WHITNEY HUSTON
A Professional Corporation
354 Pine Street, Fourth Floor
San Francisco, California 94104
Telephone: (415) 477-2410
Facsimile: (415) 477-2420
Email:
jsturdevant@sturdevantlaw.com
whuston@sturdevantlaw.com

**HOUSING AND ECONOMIC
RIGHTS ADVOCATES**
MAEVE ELISE BROWN
ELIZABETH S. LETCHER
NOAH ZINNER
CYNTHIA SINGERMAN
1814 Franklin Street, Suite 1040
Oakland, CA 94612
Telephone: (510) 271-8443
Facsimile: (510) 868-4521
Email: melisebrown@heraca.org
eletcher@heraca.org
csingerman@heraca.org

*Counsel for Plaintiffs Maria and
Pedro Betancourt*

Exh. C:  Order in Jackson v. OCWEN Loan Servicing,LLC, No.
2:10-cv-00711-MCE-GGH, 2011 U.S. Dist. LEXIS 12816 (E.D.
Cal. Feb. 8, 2011)



LEXSEE 2011 U.S. DIST. LEXIS 12816

**CHARLES S. JACKSON and LUCILLE JACKSON, Plaintiffs, v. OCWEN LOAN SERVICING, LLC., a Delaware corporation, Defendant.**

**No. 2:10-cv-00711-MCE-GGH**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF CALIFORNIA**

*2011 U.S. Dist. LEXIS 12816*

**February 8, 2011, Decided
February 9, 2011, Filed**

**PRIOR HISTORY:** *Jackson v. Ocwen Loan Servicing, LLC, 2010 U.S. Dist. LEXIS 93524 (E.D. Cal., Aug. 20, 2010)*

**COUNSEL:** **[*1]** For Charles S. Jackson, Plaintiff: Ali Nehme, LEAD ATTORNEY, Law Offices of Deborah J. Pimentel, San Ramon, CA; Deborah J. Pimentel, NCAED, LEAD ATTORNEY, Attorney at Law, San Ramon, CA.

For Lucille Jackson, Plaintiff: Deborah J. Pimentel, NCAED, LEAD ATTORNEY, Attorney at Law, San Ramon, CA.

For Ocwen Loan Servicing, LLC, a Delaware corporation, Defendant: Rebecca L. Wilson, LEAD ATTORNEY, Houser & Allison, APC, Carlsbad, CA.

**JUDGES:** MORRISON C. ENGLAND, JR., UNITED STATES DISTRICT JUDGE.

**OPINION BY:** MORRISON C. ENGLAND, JR.

**OPINION**

MEMORANDUM AND ORDER

Plaintiffs Charles and Lucille Jackson ("Plaintiffs") seek redress from Defendant Ocwen Loan Servicing, LLC ("Defendant") based on claims of breach of contract, breach of the implied covenant of good faith and fair dealing, promissory estoppel, unfair business practice, fraudulent business practice, declaratory relief for unlawful foreclosure, and financial abuse of an elder.

Plaintiffs have a Notice of Action Pending ("Lis Pendens") on their former residence at 2444 Oceanic Drive, Fairfield, CA 94533.

Presently before the Court is a Motion by Defendant to Dismiss Plaintiffs' Second Amended Complaint for failure to state a claim upon which relief may be granted pursuant **[*2]** to *Federal Rule of Civil Procedure 12(b)(6)* [1]. Defendant also moves to Expunge the Lis Pendens recorded against Plaintiffs' residence. For the reasons set forth below, Defendant's Motions to Dismiss and Expunge are granted in part and denied in part. [2]

> 1   Unless otherwise noted, all further references to Rule or Rules are to the Federal Rules of Civil Procedure.
> 2   Because oral argument will not be of material assistance, the Court deemed this matter suitable for decision without oral argument. E.D. Cal. *Local Rule 230(g)*.

**BACKGROUND**[3]

> 3   The factual assertions in this section are based on the allegations in Plaintiffs' Second Amended Complaint unless otherwise specified.

This action arises out of activity surrounding a residential loan transaction for Plaintiffs' property located in the City of Fairfield, County of Solano, California. On July 18, 2006, Plaintiffs entered into a mortgage loan for $380,700. Defendant was the servicer of Plaintiffs' mortgage.

2011 U.S. Dist. LEXIS 12816, *

In July 2009, Plaintiffs entered into a written agreement with Defendant, the Home Affordable Modification Trial Period Plan ("HAMP"). The HAMP is a home loan modification program that amends mortgages for homeowners who certify that they are  [*3] unable to afford mortgage payments on their principal residence.

In order to receive the modification agreement, homeowners must first pass through the HAMP's "trial period" of three months where they are required to make regular and timely mortgage payments, and during which time the terms of the original loan remain in place. Plaintiffs incorrectly sent their first trial period payment to the wrong address. Plaintiffs later corrected their mistake and sent payment to the correct address, but Defendant refused the payment as late, thereby causing Plaintiffs to fail the trial period and be denied the modification agreement. Plaintiffs were advised by Defendant to reapply for the HAMP, but chose not to do so.

Defendant proceeded with foreclosure on the residence and recorded a Notice of Default in the Official Records of Solano County on August 17, 2009. [4] Defendant indicates that Plaintiffs were $23,356.90 behind on their mortgage payments as of August 14, 2009. Defendant recorded the Notice of Trustee's Sale in the Official Records of Solano County on December 23, 2009. The foreclosure sale was initially scheduled for January 11, 2010, but was rescheduled on several occasions until [*4] it was eventually sold to a third party on July 27, 2010. Plaintiffs filed the present lawsuit against Defendant on January 11, 2010, and recorded a Lis Pendens on the property.

> 4   The factual assertions in this paragraph come from Defendant's Motion to Dismiss unless otherwise specified.

## STANDARD

### A. Motion to Dismiss

On a motion to dismiss for failure to state a claim under *Rule 12(b)(6)*, all allegations of material fact must be accepted as true and construed in the light most favorable to the nonmoving party. *Cahill v. Liberty Mut. Ins. Co., 80 F.3d 336, 337-38 (9th Cir. 1996)*. *Rule 8(a)(2)* requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," to "give the defendant fair notice of what the...claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)* (internal citations and quotations omitted). Though "a complaint attacked by a *Rule 12(b)(6)* motion" need not contain "detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclu-

sions, and a formulaic recitation of the elements of a cause of action will not do." *Id. at 555* [*5] (quoting *Papasan v. Allain, 478 U.S. 265, 286-9, 106 S. Ct. 2932, 92 L. Ed. 2d 209 (1986))*. A plaintiff's "factual allegations must be enough to raise a right to relief above the speculative level." Id. (citing 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216 (3d ed. 2004) ("[T]he pleading must contain something more...than...a statement of facts that merely creates a suspicion [of] a legally cognizable right of action.")).

Further, "*Rule 8(a)(2)*...requires a 'showing,' rather than a blanket assertion, of entitlement to relief. Without some factual allegation in the complaint, it is hard to see how a claimant could satisfy the requirements of providing...grounds on which the claim rests." *Twombly, 550 U.S. at 555 n.3* (internal citations omitted). A pleading must then contain "only enough facts to state a claim to relief that is plausible on its face." *Id. at 570*. If the "plaintiffs...have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed." Id.

Once the court grants a motion to dismiss, they must then decide whether to grant a plaintiff leave to amend. *Rule 15(a)* authorizes the court to freely grant leave to amend when there is no "undue delay, bad faith, [*6] or dilatory motive on the part of the movant." *Foman v. Davis, 371 U.S. 178, 182, 83 S. Ct. 227, 9 L. Ed. 2d 222 (1962)*. In fact, leave to amend is generally only denied when it is clear that the deficiencies of the complaint cannot possibly be cured by an amended version. See *DeSoto v. Yellow Freight Sys., Inc., 957 F.2d 655, 658 (9th Cir. 1992)*; *Balistreri v. Pacifica Police Dept., 901 F. 2d 696, 699 (9th Cir. 1990)* ("A complaint should not be dismissed under *Rule 12(b)(6)* unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.") (internal citations omitted).

### B. Motion to Expunge Lis Pendens

"A Lis Pendens is recorded by someone asserting a real property claim, to give notice that a lawsuit has been filed which may, if that person prevails, affect title to possession of the real property described in the notice." *Fed. Deposit Ins. Corp. v. Charlton, 17 Cal. App. 4th 1066, 1069, 21 Cal. Rptr. 2d 686 (1993)* (citing *Cal. Civ. Proc. Code §§ 405.2, 405.4*, and *405.20*). A Lis Pendens, once filed, prevents the property's transfer until the Lis Pendens is expunged or the litigation is resolved. *BGJ Assocs., LLC v. Super. Ct. Of L.A., 75 Cal. App. 4th 952, 966-67, 89 Cal. Rptr. 2d 693 (1999)*. [*7] The Lis Pendens is expunged if the pleading on which the Lis Pendens is based does not contain a real property claim, or if the evidence fails to establish the probable validity of the real property claims. *Orange Cnty. v. H.K. and*

*Shanghai Banking Corp. Ltd., 52 F.3d 821, 823-24 (9th Cir. 1995).* To constitute a "real property claim," the cause of action, if meritorious, must affect the right of possession of specific real property or affect the title to the specific real property. *Cal. Civ. Proc. Code § 405.4.* The "probable validity" standard means "it is more likely than not that the claimant will obtain a judgment against the defendant on the claim." Id. at *§ 405.3.*

## ANALYSIS

### A. Motion to Dismiss

### 1. Breach of Contract

Under California law, to state a claim for breach of contract, a plaintiff must plead: (1) existence of the contract; (2) plaintiff's performance or excuse for nonperformance of the contract; (3) defendant's breach of the contract; and (4) resulting damages. *Armstrong Petrol. Corp. v. Tri Valley Oil & Gas Co., 116 Cal. App. 4th 1375, 1391 n.6, 11 Cal. Rptr. 3d 412 (2004).*

Plaintiffs and Defendant disagree on whether the HAMP is a contract under law. Because the Court reviews this claim on a motion **[*8]** to dismiss standard, Plaintiffs need only allege sufficient facts to raise their breach of contract claim above mere speculation. Plaintiffs have pled enough facts under this standard to fairly argue that the HAMP is an enforceable contract, that they had performed contractual obligations under the HAMP, and that Defendant subsequently refused to perform. Defendant's Motion to Dismiss Plaintiffs' first claim for breach of contract is denied.

### 2. Breach of Good Faith and Fair Dealing

The implied covenant of good faith and fair dealing rests upon the existence of some specific contractual obligation. *Foley v. Interactive Data Corp., 47 Cal. 3d 654, 683-84, 254 Cal. Rptr. 211, 765 P.2d 373 (1998).* The covenant of good faith is read into contracts to protect the express terms or promises of the contract. *Id. at 690.*

This covenant is particularly well-suited to situations where one party has discretionary power affecting the rights of another. *Carma Developers Cal., Inc. v. Marathon Dev. Cal., Inc., 2 Cal. 4th 342, 372, 6 Cal. Rptr. 2d 467, 826 P.2d 710 (1992).*

Assuming the HAMP even constitutes a binding contract, Plaintiffs' claim for breach of good faith and fair dealing is sufficient to withstand a motion to dismiss. Plaintiffs allege that Defendant acted **[*9]** in bad faith by refusing to accept their first payment, which would have ensured their compliance with the HAMP. Further, this payment was delayed as a direct result of Defen-

dant's omission of information necessary for Plaintiffs to successfully perform their obligations. Thus, Defendant's Motion to Dismiss Plaintiffs' second claim for breach of good faith and fair dealing is denied.

### 3. Promissory Estoppel

Promissory estoppel makes a "promise binding under certain circumstances, without consideration in the usual sense of something bargained for and something given in exchange." *Garcia v. World Savs., FSB, 183 Cal. App. 4th 1031, 1040-41, 107 Cal. Rptr. 3d 683 (2010)* (citing *Youngman v. Nev. Irrigation Dist., 70 Cal. 2d 240, 249, 74 Cal. Rptr. 398, 449 P.2d 462 (1969)).* If, by language or conduct, an individual leads another to do what he otherwise would not have done, then he should not be denied the "expectations upon which he acted." Id. Absence of consideration does not defeat a claim based on promissory estoppel. Id.

The required elements are: (1) a clear and unambiguous promise in its terms; (2) reliance that is reasonable and foreseeable; and (3) an injury that results from reliance. *Laks v. Coast Fed. Sav. & Loan Assn., 60 Cal. App. 3d. 885, 890, 131 Cal. Rptr. 836 (1976).*

Plaintiffs **[*10]** have properly pled the elements for a promissory estoppel claim. They allege that Defendant promised to provide to them a loan modification upon completion of their obligations under the HAMP. This promise is clear and unambiguous from the written document provided. And because this document was in a writing signed by both parties, Plaintiffs' reliance on that promise was reasonably foreseeable as they acted in conformity with the express terms of the writing. Defendant's Motion to Dismiss Plaintiffs' third claim for promissory estoppel is denied.

### 4. Unfair Business Practice under California law

*California Business and Professions Code § 17200, et seq.,* more commonly known as California's Unfair Competition Law ("UCL"), defines unfair competition as "any unlawful, unfair or fraudulent business act or practice". A claim for "unfair" business practices under the UCL requires a plaintiff to "tether" its allegation to a constitutional or statutory provision or a regulation carrying out statutory policy. *Webb v. Smart Document Solutions, LLC, 499 F.3d 1078, 1082-83 (9th Cir. 2007).*

See also *Ferrington v. McAfee, Inc., No. 10-01455, 2010 U.S. Dist. LEXIS 106600, 2010 WL 3910169 at *11-13 (N.D. Cal., Oct. 5, 2010), Buller v. Sutter Health, 160 Cal. App. 4th 981, 991, 74 Cal. Rptr. 3d 47 (2008)* **[*11]** (citing *Belton v. Comcast Cable Holdings, LLC., 151 Cal. App. 4th 1224, 1239-40, 60 Cal. Rptr. 3d 631 (2007)).* [5]

5   California courts are split as to the appropriate test for finding business practices "unfair" under the UCL as they pertain to consumers as opposed to direct competitors. Ninth Circuit courts have ruled that either standard will be upheld. Therefore, the Court need not address the dispute. *Lozano v. AT&T Wireless Services, Inc., 504 F.3d 718, 736-37 (9th Cir. 2007).*

Plaintiffs provide no facts indicating that a constitutional or statutory policy prohibits the actions allegedly taken by Defendant. Since Plaintiffs have not tethered their allegations to any constitutional or statutory provision as required, their claim for unfair business practices is insufficient to withstand dismissal. Defendant's Motion to Dismiss Plaintiffs' fourth claim for unfair business practices is granted.

### 5. Fraudulent business practices under California law

A "fraudulent" business act or practice claim under the UCL requires a plaintiff to allege that consumers are likely to be deceived by the defendant's conduct. *Comm. on Children's Television, Inc. v. Gen. Foods Corp., 35 Cal. 3d 197, 212, 197 Cal. Rptr. 783, 673 P.2d 660 (1983).* Under the heightened  **[\*12]** pleading standard of *Rule 9(b)*, when alleging fraud, a plaintiff must state with particularity specific facts or circumstances constituting fraud.

Plaintiffs have properly alleged that consumers are likely to be deceived by Defendant's omission of the correct address in the HAMP. However, they have failed to plead any facts or circumstances indicating why Defendant's failure to act rises to the level of fraud. Plaintiffs bear the burden of demonstrating Defendant's conduct was not mere omission, but an actual fraudulent business practice. Plaintiffs' own conclusion that the conduct amounts to fraud is insufficient under the heightened pleading standard of *Rule 9(b)*. Defendant's Motion to Dismiss Plaintiffs' fifth claim for fraudulent business practices is granted.

### 6. Unlawful foreclosure/Request for declaratory relief

*California Civil Code § 2923.5* precludes lenders in California from filing a notice of default to begin foreclosure until thirty days after making initial contact with the homeowners, and satisfying certain due diligence requirements as detailed in the statute. Courts have found this statute to create a private right of action, however, the right is limited to preventing  **[\*13]** an impending foreclosure. *Mabry v. Superior Court, 185 Cal. App. 4th 208, 214-15, 110 Cal. Rptr. 3d 201 (2010).* If the foreclosure sale has already been completed, a plaintiff has no right to further legal action under this section, regard-

less of the lender's failure to comply with the statutory requirements. Id.

Because the sale of Plaintiffs' home was completed in July 2010, we do not reach a judgment as to whether Defendant violated *§ 2923.5*. Plaintiffs have no valid claim under *Cal. Civ. Code § 2923.5*. Defendant's Motion to Dismiss Plaintiffs' sixth claim for declaratory relief is granted.

### 7. Financial abuse of an elder

*California Welfare and Institutions Code § 15610.30* prohibits financial abuse of an elder. An "elder" is defined as a person over the age of 65. *Cal. Welfare & Inst. Code § 15610.27.* A defendant violates this statute if the defendant itself, or in assistance of another, takes, secretes, appropriates, obtains, or retains real or personal property of an elder for a wrongful use, with intent to defraud, or by undue influence. *Cal. Welfare & Inst. Code § 15610.30.*

Plaintiff Mrs. Jackson was not over 65 at the time of the alleged violation and, as such, lacks standing to bring this claim. Plaintiff  **[\*14]** Mr. Jackson does meet the age requirement, however, he does not plead sufficient facts to suggest Defendant forced him, with intent to defraud or by undue influence, to send his payment to a different address, or to somehow become late on payments thereby causing him to lose his property. Nor does the complaint demonstrate that Defendant took his property for a wrongful use. Thus, Defendant's Motion to Dismiss Plaintiffs' seventh claim for financial abuse of an elder is granted.

### B. Motion to Expunge Lis Pendens

A recorded Lis Pendens may only be expunged if the pleading on which the Lis Pendens is based does not contain a real property claim, or if the evidence fails to establish the probable validity of the real property claim. *Orange Cnty. v. H.K. and Shanghai Banking Corp. Ltd., 52 F.3d 821, 823-24 (9th Cir. 1995)*; see supra.

The Court finds that at this stage of the litigation, when Plaintiffs' allegations of fact must be accepted as true, it is not yet possible to make a finding by a preponderance of the evidence that Plaintiffs' real property claims are valid. Regardless of whether these claims are ultimately meritorious, there is an action currently pending which may affect title  **[\*15]** to the real property. As a notice of pending action, a Lis Pendens, is primarily recorded as a signal to the world that a suit has been filed regarding the property so that there will not be a bona fide purchaser for value without notice. A ruling that would expunge such notification necessarily requires further litigation than has presently transpired. Accord-

2011 U.S. Dist. LEXIS 12816, *

ingly, Defendant's Motion to Expunge Lis Pendens is denied without prejudice.

**CONCLUSION**

As a matter of law, and for the reasons set forth above, Defendant's Motion to Dismiss Plaintiffs' Second Amended Complaint (ECF No. 24) is GRANTED without further leave to amend as to Claims 4, 5, 6 and 7, and DENIED as to Claims 1, 2, and 3. Defendant's Motion to Expunge the Lis Pendens is DENIED without prejudice.

The parties are to file a joint status report within 30 days of this Order being electronically filed.

IT IS SO ORDERED.

Dated: February 8, 2011

/s/ Morrison C. England, Jr.

MORRISON C. ENGLAND, JR.

UNITED STATES DISTRICT JUDGE

Exh. D:   Order in Darcy v. CitiFinancial, Inc. and CitiMortgage, Inc., United States District Court for the Western District of Michigan, Case No. 1:10-cv-848, filed Mar. 1, 2011 (Docket No. 39)

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SHELIA M. DARCY,

       Plaintiff,                                Case No. 1:10-cv-848

v                                           HON. JANET T. NEFF

CITIFINANCIAL, INC. and
CITIMORTGAGE, INC.,

       Defendants.
_____/

## PRELIMINARY INJUNCTION

On February 7, 2011, the Court entered a Temporary Restraining Order (Dkt 32) enjoining Defendants' sale of Plaintiff's home in foreclosure by advertisement proceedings during the pendency of this action. The matter is now before the Court on the issue of a preliminary injunction. Having considered the parties' briefs and having heard oral argument from the parties on February 28, 2011, for the reasons stated on the record, the Court determines that plaintiff's motion for a preliminary injunction is properly granted.

When deciding whether to issue a preliminary injunction, the court considers four factors: (1) whether the party has a strong likelihood of success on the merits, (2) whether the party would suffer irreparable injury absent an injunction, (3) whether the issuance of an injunction would cause substantial harm to others, and (4) whether an injunction is in the public interest. *Leary v. Daeschner,* 228 F.3d 729, 736 (6th Cir. 2000); *Mason County Medical Ass'n v. Knebel,* 563 F.2d 256, 261 (6th Cir. 1977). The factors are not prerequisites to the grant of a preliminary injunction, but are interrelated considerations that must be balanced together. *Leary,* 228 F.3d at 736.

As the party seeking the injunctive relief, a plaintiff bears the burden of persuasion on each of these factors. *American Standard, Inc. v. Meehan,* 517 F. Supp. 2d 976, 982 (N.D. Ohio 2007). However, the likelihood of success that need be shown may vary inversely with the degree of injury the plaintiff will suffer absent an injunction. *In re DeLorean Motor Co.,* 755 F.2d 1223, 1229 (6th Cir. 1985).

In accordance with the Court's findings and conclusions on the record, the Court determines that a preliminary injunction is warranted. With regard to the likelihood of success on the merits, plaintiff has set forth case law in support of her claims to show that her claims are viable, contrary to defendants' arguments. Given the early stage of these proceedings, the Court lacks the necessary factual predicate to more fully evaluate the merits of the claims presented. Weighing heavily in favor of injunctive relief is the irreparable harm to plaintiff of losing her home, where she has resided since 1989, which potentially would leave her homeless. There is no potential for substantial harm to others on issuance of an injunction and at least arguable public interest in issuing an injunction in that it will prevent the potential homelessness of the plaintiff.

Thus, having carefully weighed the considerations and in particular, the questions concerning the merits, coupled with the irreparable harm plaintiff will suffer absent an injunction, the Court concludes that they decidedly outweigh any potential harm to defendant if a preliminary injunction is entered. *See In re DeLorean Motor Co.,* 755 F.2d at 1229.

**THEREFORE, IT IS ORDERED** that the Plaintiff's Motion for Preliminary Injunction is GRANTED.

**IT IS FURTHER ORDERED** that Defendants and their agents, officers, employees, assigns, and attorneys, including the Ingham County Sheriff's Department and any court officers of

Ingham County Circuit Court, are enjoined from selling Plaintiff's home at 746 Princeton Avenue,

Lansing, Michigan pending adjudication of this case on the merits or until further order of this

Court.

**IT IS FURTHER ORDERED** that bond requirements under Federal Rule Civil Procedure

65(c) are WAIVED given plaintiff's financial inability to pay and the public interest at stake.


Date: March 1, 2011                      /s/ Janet T. Neff
                                         _____
                                         JANET T. NEFF
                                         United States District Judge

Exh. E:   Plaintiff's Reply to Defendants' Response in Opposition
to Plaintiff's Motion for Temporary Restraining Order and
Preliminary Injunction in Darcy v. CitiFinancial, Inc. and
CitiMortgage, Inc., United States District Court for the Western
District of Michigan, Case No. 1:10-cv-848, filed Feb. 23, 2011
(Docket No. 36)

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SHELIA M. DARCY,

       Plaintiff,

v.

CITIFINANCIAL, INC. and
CITIMORTGAGE, INC.,

      Defendants.

_____/

CIVIL ACTION

Case No. 1:10-cv-848
Honorable Janet T. Neff

**PLAINTIFF'S REPLY TO
DEFENDANTS' RESPONSE
IN OPPOSITION TO
PLAINTIFF'S MOTION
FOR TEMPORARY
RESTRAINING ORDER
AND PRELIMINARY
INJUNCTION**

**PLAINTIFF'S REPLY TO DEFENDANTS' RESPONSE
IN OPPOSITION PLAINTIFF'S MOTION FOR TEMPORARY
RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

**INTRODUCTION**

In response to Ms. Darcy's motion for a temporary restraining order and preliminary

injunction, Defendants argue that the Anti-injunction Act precludes this Court from enjoining the

foreclosure sale. Defendants also argue that Ms. Darcy cannot prevail on her breach of contract

claim. On July 26, 2010, Ms. Darcy filed her Complaint in state court. In her request for relief,

Ms. Darcy asks that the state court enjoin Defendants from attempting to foreclose on her home.

Subsequently, Defendants removed Ms. Darcy's case to federal court. On January 20, 2011,

with leave from the Court, Ms. Darcy filed an Amended Complaint that clarified that this was a

case based solely on state law claims, i.e., breach of contract, breach of the duty of good faith

and fair dealing, and alternatively, a promissory estoppel. As Ms. Darcy did not allege a federal

question in her Amended Complaint, Defendants, to ensure that this Court retained jurisdiction, asserted diversity jurisdiction.  It is disingenuous to now assert that this Court does not have jurisdiction to grant the relief requested in Ms. Darcy's Complaint.

### The Anti-Injunction Act Is Inapplicable to Foreclosures By Advertisement.

The Anti-injunction Act provides that "[a] court of the United States may not grant an injunction to stay *proceedings in a State court* except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." (emphasis added). 28 U.S.C § 2283.   The operative phrase in this statute is *"proceedings in a state court"*.  In Michigan, a foreclosure by advertisement is not a judicial procedure but rather a nonjudicial procedure. In a foreclosure by advertisement, no state court proceeding is initiated. As such, a sheriff's sale pursuant to a foreclosure by advertisement is not a "proceeding in a state court."

Michigan courts have long recognized that foreclosure by advertisement is nonjudicial.  *See Moss v Keary, et al,* 231 Mich. 295, 298, 204 N.W. 93, 94 (1925) (foreclosure by advertisement "is an ex parte nonjudicial proceeding, based on contract, and authorized by the mortgagor."). *See also Northrip v Federal National Mortgage Ass'n*, 527 F.2d. 23, 29 ( 6th Cir. 1975) (Michigan foreclosure by advertisement does not involve state action).  In a similar case, the court held "the foreclosure by advertisement … or non-judicial foreclosure proceeding, … is not a 'proceeding in a State court' for purposes of the Anti-Injunction Act.")  *Rea v Wells Fargo Home Mortgage*, 2009 WL 2750935 *7 (E.D. Mich. Aug. 25, 2009).

The cases relied upon by Defendants are misplaced.  Those cases had some state court proceedings.  For example, in *Nixon v Individual Head of St. Joseph Mortgage*, 612 F. Supp.

253, 255 (N.D. Indiana 1985), the Indiana district court held that the Anti-Injunction Act "prohibits the granting of injunctions to stay state court proceedings, including mortgage foreclosure actions." However, Indiana is a judicial foreclosure state. To foreclose in Indiana, the foreclosing party is required to file a court action. See Ind. Code § 32-29-1-3. ("A mortgage of real estate, including an instrument having the legal effect of a mortgage, may not authorize the mortgagee to sell the mortgaged property. The sale of mortgaged property by the mortgagee may only be made under a judicial proceeding.") The other cases Defendants relied on involved eviction proceedings in state court. *See Cheff v US Bank Ass'n*, 2011 WL 308173 (E.D. Mich. Jan 27, 2011)(plaintiff asks to stay the eviction proceeding); *Leavell v Wells Fargo Bank*, 2009 WL 1439915 (E.D. Mich. May 19, 2009)(pending eviction proceeding).

In this case, Ms. Darcy asks this Court to enjoin the sheriff's sale. The sheriff's sale is a nonjudicial action. Consequently, the Anti-Injunction Act does not apply in this case.

## Ms. Darcy Will Likely Succeed On Her Breach of Contract Claims.

Defendants argue that Ms. Darcy cannot prevail on her breach of contract claims. In making their argument, Defendants attempt to confuse the issues in this case by directing this Court's attention to issues involving the contract between the Defendants and Treasury (Servicer Participation Agreement (SPA)) and entitlement issues under HAMP. Def. Response. at 9-10 [Dkt. #33]. However, those issues are not relevant in this case. Ms. Darcy's claims arise under a written contract with Defendants not the federal HAMP guidelines. Defendants advised Ms. Darcy to follow certain procedures and were promised in a signed written agreement that following those steps would result in an affordable, permanent loan modification within three months. Those promises were broken. The stimulus bill, TARP, the Servicer Participation

Agreement, and the HAMP Program Documentation are relevant only as context, in that they provided guidelines for Defendants' actions. But they do not form any part of the legal predicate for Ms. Darcy's claims based in contract. Thus, the existence or lack thereof of a private right of action "under HAMP or TARP" or the viability of third party beneficiary claims under HAMP or TARP are irrelevant.

Defendants' reliance on *Hart v Countrywide Home Loans, Inc.*, 735 F. Supp.2d 741 (E.D. MI. 2010) and *Adams v U.S. Bank*, 2010 WL 2670702 (E.D. Mich. July 1, 2010) is misplaced. In *Hart*, the plaintiff alleged that defendant Countrywide violated the Housing and Economic Recovery Act, HAMP and the Emergency Economic Stabilization Act when Countrywide did not review her mortgage for a loan modification. The court determined that plaintiff had no right of action under those "Lending Statutes". In *Adams*, the plaintiff seemed to allege that she was promised a loan modification based on oral representations after she submitted her loan modification application. The court did not find that plaintiff stated a claim based on her allegations. *See also Aleem v. Bank of America*, No. EDCV 09-01812, 2010 WL 532330 at *3, (C.D. Cal. Feb. 9, 2010) ( finding that the plaintiffs did not state a federal cause of action by pleading a violation of HAMP under the California Business and Professions Code). To suggest, as Defendants do, that these cases abrogate Defendants' independent responsibility to meet its written contractual obligations is absurd. If accepted, no Plaintiff could ever enforce a modification agreement made under HAMP.

**The Trial Period Plan (TPP) Agreement Is A valid, Enforceable Contract.**

The TPP Agreement contains all the elements of an enforceable contract. The TPP Agreement contains unequivocal terms. The first sentence of the TPP Agreement provides:

> If I am in compliance with this Trial Period Plan…, then the Servicer
> will provide me with a Home Affordable Modification Agreement.

This language contains mandatory language – if the homeowner complies with the agreement, then Defendants will provide him or her with a permanent modification. In fact, *Williams v. Geithner*, Civil No. 09-1959 ADM/JJG, 2009 WL 3757380, at *3 (D. Minn. Nov. 9, 2009), cited by Defendants, recognized the binding nature of this language.  The *Williams* Court, interpreting HAMP rules, recognized that servicers evaluate borrower eligibility prior to the offer of a TPP Agreement and that compliance with an accepted TPP Agreement mandates a permanent modification: "If the loan qualifies for a modification after consideration of all the [eligibility] factors, the servicer is obligated to provide a trial period loan modification. If the borrower remains current throughout the trial period, the servicer must then provide a loan modification." *Id*. 2009 WL 3757380, at *3. It is this obligation that is memorialized in the TPP Agreement language at issue here.

Other courts have found that the TPPs are complete, valid contracts.  *See e.g. Faulkner v Onewest Bank*, 2010 WL 2472275 *9 (N.D.W.Va. June 16, 2010)(finding plaintiffs have sufficiently stated a claim for breach of contract); *Hanson v Wells Fargo Home Mortgage*, 2010 WL 3310615 *2 (E.D. Ark. Aug. 18, 2010)(denying Wells Fargo motion to dismiss plaintiffs' breach of contract claims as plaintiffs sufficiently stated a claim); *Wells Fargo v Meyers*, 913 N.Y.S.2d 500, 504 (Nov. 10, 2010)(finding that homeowners complied with all the requirements of the trial modification agreement and ordering Wells Fargo to execute the final modification based on the terms of the agreement); *Durmic v J.P. Morgan Chase Bank,* 2010 WL 4825632 *3-4 (D. Mass. Nov. 24, 2010)(denying lender's motion to dismiss homeowners' breach of contract claim); *Bosque v Wells Fargo Bank,* ___ F.Supp.2d ___, 2011 WL 304725 *5-7 (D. Mass. Jan. 26, 2011)(finding that TPPs were offers to contract and homeowners' signatures and

monthly payments constituted acceptances; and homeowners' have sufficiently alleged that TPP was supported by consideration); and *Jackson v Ocwen Loan Servicing, LLC*, 2011 U.S. Dist. LEXIS 12816 *8 (E.D. Cal. Feb. 9, 2011) ("Plaintiffs have pled enough facts … to … argue that the HAMP is an enforceable contract, that they had performed contractual obligations under HAMP, and that Defendant subsequently refused to perform"). Given the foregoing, Ms. Darcy has a strong likelihood of success on the merits.

### Ms. Darcy Will Suffer Irreparable Harm.

Ms. Darcy will lose her home and likely to become homeless and her capacity to own another home disrupted for many years to come. *See Smith v. State Farm Fire and Casualty Co.*, ___ F.Supp.2d ___, 2010 WL 3270116, at *10 (E.D. Mich. Aug. 17, 2010) (finding threatened homelessness to be irreparable harm); *O'Hagan v. United States*, 86 F.3d 776, 783 (8th Cir. 1996) (finding impending foreclosure to constitute irreparable harm); *Sundance Land Corp. v. Cmty. First Fed. Sav. & Loan Ass'n*, 840 F.2d 653, 661(9th Cir. 1988) (same); *Deans v. Long Beach Mortgage*, 2007 WL 772892 (W.D. Mich. Mar. 12, 2007) (same). Other cases have held that the threat of eviction and homelessness satisfy the irreparable harm requirement. See *Baumgarten v. County of Suffolk,* No. 07-539, 2007 WL 1490487 at *5 (E.D.N.Y. Feb. 20, 2007)*, McNeill v. New York City Hous. Auth.,* 719 F. Supp. 233, 254 (S.D.N.Y.1989)*; Calvagno v. Bisbal,* 430 F. Supp. 2d 95, 100 (E.D.N.Y.2006)*; Mitchell v. United States Dep't of Hous. & Urban Dev.* 569 F. Supp. 701 (N.D. Cal.1983). *See also Park Village Apts. Tenants Assoc. v. Mortimer Howard Trust,* No. 09-4780, 2010 WL 431458, at *3 (N.D. Cal. Feb. 1, 2010)*.

## CONCLUSION

Based on the foregoing, Ms. Darcy respectfully asks this Court to continue the order enjoining Defendants from foreclosing on her home and to maintain the *status quo*.

Respectfully submitted,

s/Lorray S.C. Brown                                          Dated: February 23, 2011
MICHIGAN POVERTY LAW PROGRAM
By: Lorray S.C. Brown (P60753)
Attorney for Plaintiff
 220 East Huron Street, Suite 600A
Ann Arbor, Michigan 48104
(734) 998-6100, ext 113
lorrayb@lsscm.org

s/Kellie Makie                                                    Dated: February 23, 2011
LEGAL SERVICES OF SOUTH CENTRAL
MICHIGAN
By:  Kellie Maki (P70357)
Attorney for Plaintiff
3490 Belle Chase Way, Suite 50
Lansing, Michigan 489112
(517) 394-2985
kamaki@lsscm.org

CERTIFICATE OF SERVICE

I certify that on February 23, 2011, I electronically filed the foregoing document with the Clerk of the Court using the ECF system which will send notification of such filing to the following:

Kellie Maki
kamaki@lsscm.org

Lorray S.C. Brown
lorrayb@lsscm.org

Richard Welke
rwelke@trottlaw.com

Respectfully submitted,

s/Lorray S.C. Brown_____
MICHIGAN POVERTY LAW PROGRAM
By: Lorray S.C. Brown (P60753)
Co-counsel for Plaintiff
220 East Huron Street, Suite 600A
Ann Arbor, Michigan 48104
(734) 998-6100, ext 113
lorrayb@lsscm.org

Dated: February 23, 2011

Exh. F:  Plaintiff's Brief in Support of Plaintiff's Motion for
Temporary Restraining Order and Preliminary Injunction, in Darcy
v. CitiFinancial, Inc. and CitiMortgage, Inc., United States District
Court for the Western District of Michigan, Case No. 1:10-cv-848,
filed Feb. 7, 2011 (Docket No. 30)

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SHELIA M. DARCY,

        Plaintiff,

v.

CITIFINANCIAL, INC. and
CITIMORTGAGE, INC.,

        Defendants.

CIVIL ACTION

Case No. 1:10-cv-848
Honorable Janet T. Neff

_____/

**BRIEF IN SUPPORT OF PLAINTIFF'S
MOTION FOR TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES …………………………………………………………..…ii

STATEMENT OF ISSUES PRESENTED ……………………………………………..…iii

 INTRODUCTION/FACTS ……………………………………...……………………… 1

ARGUMENT ………………………………………………………………………… 1

    I.   Preliminary Injunction Standard.................................................................... 1

    A.   Strong Likelihood to Succeed on the Merits ................................................ 2

    B.   Irreparable Harm ........................................................................................ 3

    C.   No Substantial Harm to Others .................................................................... 4

    D.   Injunction is in the Public Interest ............................................................. 4

    II.   The Bond Requirement Should be Waived ................................................... 5

CONCLUSION ……………………………………………………………………… 6

CERTIFICATE OF SERVICE ……………………………………………………..… 7

## TABLE OF AUTHORITIES

**Cases**

*Bosque v. Wells Fargo Bank,* ___ F.Supp.2d ___, 2011 WL 304725
(D. Mass. Jan. 26, 2011) ……………………………………………………………….3

*Cheatham v. Donovan,* 2009 WL 2922150 (E.D. Mich. 2009) ………...…………………….....5

*Durmic v. J.P. Morgan Chase Bank,* 2010 WL 4825632 (D. Mass. Nov. 24, 2010) ……...……...3

*Eerdmans v. Maki,* 226 Mich. App. 360 (1997) …………..……………………………..………2

*English Gardens Condo, LLC  v. Howell Twp*, 274 Mich. App. 69 (2007) …………...…..…..……2

*Guillermety v. Secretary of Educ.,* 241 F.Supp.2d. 727 (E.D. Mich. 2002) ……………..…..……5

*Hanson v. Wells Fargo Home Mortgage,* 2010 WL 3310615 (E.D. Ark. Aug. 18, 2010) ……….3

*Kirchhoff v. Morris,* 282 Mich. 90 (1937) …………..……………………………………………2

*Livonia Property Holdings v. 12840-12976 Farmington Road Holdings*, 717 F.Supp.2d 724
(E.D. Mich. 2010) ............................................................................................................... 2

*Sayo, Inc. v. Zions First Nat'l Bank,* No. 06-14963, 2006 WL 3240706 (E.D.Mich. Nov. 7, 2006)
............................................................................................................................................. 4

*Sluiter v. Blue Cross and Blue Shield,* 979 F.Supp. 1131 (E.D. Mich. 1997) ……...…………….5

*Smith v. State Farm Fire and Casualty Co.*, ___ F.Supp.2d ___, 2010 WL 3270116 (E.D.Mich.
Aug. 17, 2010) ................................................................................................................. 3, 4

*United States v. Edward Rose & Sons*, 384 F.3d 258 (6th Cir. 2004) …………...………………..2

*Webster v. Edward D. Jones & Co.,* 197 F.3d 815 (6th Cir. 1999) ………...…………………..2

*Winter v. National Resource Defense Council*, 555 U.S. 7, 129 S.Ct. 365 (2008)........................ 2

**STATEMENT OF ISSUES PRESENTED**

Plaintiff, Ms. Shelia M. Darcy, is seeking a temporary restraining order and a preliminary injunction enjoining the non-judicial foreclosure sale of her home, scheduled for February 10, 2011. Should this Court enter a temporary restraining order and preliminary injunction that: 1) orders defendants to refrain from pursuing non-judicial foreclosure, including the sheriff's sale scheduled for Thursday, February 10, 2011; and 2) grants whatever further relief to the plaintiff the Court deems necessary to protect the plaintiff and to preserve the *status quo*?

## INTRODUCTION/FACTS

Plaintiff Shelia Darcy brings this action to enforce an agreement she entered into with Defendant CitiMortgage.  In August 2009, Defendant offered Ms. Darcy a Trial Period Plan (TPP) Agreement under the Home Affordability Modification Program (HAMP).  HAMP was developed by the United States Treasury pursuant to its authority under the federal Troubled Asset Relief Program (TARP).  *See* Emergency Economic Stabilization Act (ESSA), 12 USC § 5201 et seq.

The terms of the TPP Agreement required that Ms. Darcy makes three monthly payments from September 2009 through November 2009.  After making the three payments under the TPP Agreement, and complying with the terms of the TPP Agreement, such as submitting financial documentation, Defendant would provide Ms. Darcy a permanent HAMP loan modification.  Ms. Darcy complied with the terms of the TPP Agreement in addition to making the three monthly payments.  However, Defendants have yet to give Ms. Darcy a permanent HAMP modification.  As a result, Ms. Darcy brings this action to make Defendants live up to their promise.

## ARGUMENT

### I.  Preliminary Injunction Standard

In *Winter v. National Resource Defense Council*, 555 U.S. 7, 129 S.Ct. 365 (2008) the Supreme Court established the standard for securing a preliminary injunction. "A plaintiff seeking a preliminary injunction must establish (1) that he has a strong likelihood to succeed on

1

the merits; (2) that he is likely to suffer irreparable harm without the injunction; (3) that the injunction would not cause substantial harm to others; and (4) that an injunction is in the public interest." *Winter*, 129 S.Ct. at 374. This standard is followed in this circuit. *See Livonia Property Holdings v. 12840-12976 Farmington Road Holdings*, 717 F.Supp.2d 724 (E.D. Mich. 2010). Further, the purpose of injunctive relief is to maintain the *status quo*. *United States v Edward Rose & Sons,* 384 F.3d 258, 261 (6th Cir. 2004). Ms. Darcy meets all of the requirements under the preliminary injunction standard.

### A. Strong Likelihood to Succeed on the Merits

Ms. Darcy brings this action for breach of contract, breach of the duty of good faith and fair dealing and alternatively, promissory estoppel. Michigan courts recognize that there is an implied covenant of good faith and fair dealing in every contract. *See English Gardens Condo, LLC v. Howell Twp*, 274 Mich App 69, 75 (2007) (rev'd on other grounds).

"Under Michigan law, the essential elements of a breach of contract claim are: 1) the existence of a contract between the parties, 2) the terms of the contract, 3) that defendant breached the contract, and 4) that the breach caused the plaintiff injury." W*ebster v. Edward D. Jones & Co.,* 197 F.3d 815, 819 (6th Cir. 1999). The essential elements of a valid contract include offer, acceptance, and consideration. *Kirchhoff v. Morris,* 282 Mich. 90, 95 (1937); *Eerdmans v. Maki,* 226 Mich. App. 360, 364 (1997).

In this case, the Trial Period Plan Agreement was an offer made by Defendants to Ms. Darcy. Ms. Darcy accepted the offer by signing the agreement. Further, Ms. Darcy's compliance with the terms of the TPP can constitute consideration. Her compliance included not

only making monthly payments but also providing documentations to defendants. Other courts that have considered this same issue – whether homeowners who signed TPP agreements with lenders have sufficiently alleged a breach of contract claim – have held that the borrowers' breach of contract claims were sufficient to survive motions to dismiss by lenders. *See, eg, Bosque v Wells Fargo Bank,* ___ F.Supp.2d ___, 2011 WL 304725 *5-7 (D. Mass. Jan. 26, 2011)(finding that TPPs were offers to contract and homeowners' signatures and monthly payments constituted acceptances; and homeowners' have sufficiently alleged that TPP was supported by consideration); *Durmic v J.P. Morgan Chase Bank,* 2010 WL 4825632 *3-4 (D. Mass. Nov. 24, 2010)(denying lender's motion to dismiss homeowners' breach of contract claim); *Hanson v Wells Fargo Home Mortgage,* 2010 WL 3310615 * 2-3 (E.D. Ark. Aug. 18, 2010)(denying lender's motion to dismiss homeowners' breach of contract and promissory estoppel claims).

## B.  Irreparable Harm

Ms. Darcy will suffer irreparable harm if Defendants are allowed to proceed to a foreclosure sale on her home as they intend to do. Defendants have advised Ms. Darcy of her default on her loan and have noticed the foreclosure sale for February 10, pursuant to Michigan law. When the foreclosure sale is conducted, Ms. Darcy will lose title to her home and will be forced to relocate to other housing, something that she cannot do given her current financial circumstances.

The mere loss of one's home has been held to constitute irreparable harm sufficient to justify the grant of a temporary restraining order and a preliminary injunction. *Smith v. State*

*Farm Fire and Casualty Co.*, ___ F.Supp.2d ___, 2010 WL 3270116, at *10 (E.D.Mich. Aug.

17, 2010), *Sayo, Inc. v. Zions First Nat'l Bank*, No. 06-14963, 2006 WL 3240706 at *2

(E.D.Mich. Nov. 7, 2006). Moreover, Ms. Darcy is threatened with homelessness, which, has

also been held to constitute irreparable harm. *Smith v. State Farm Fire and Casualty Co*., ___

F.Supp.2d ___, 2010 WL 3270116, at *10 (E.D.Mich. Aug. 17, 2010). Further, Ms. Darcy

cannot be compensated with monetary damages for either of these enormous losses. Thus, the

entry of a preliminary injunction pending resolution of this case will enable Ms. Darcy to retain

her home.

### C. No Substantial Harm to Others

Ms. Darcy faces loss of her home and homelessness. By contrast, defendants do not face

any significant losses. Ms. Darcy's loan is secured by a mortgage and the value of the property is

not likely to decrease pending resolution of this litigation. Thus, the only losses that defendants

will incur during the pendency of this case are the loss of mortgage payments that Ms. Darcy

may make. For defendants this is likely to be a minimal loss since under Michigan Redemption

Law, Ms. Darcy retains the right of possession to the property for a term of 6 months, during

which she has no obligation to pay rent. Significantly, if Ms. Darcy prevails in this litigation and

is able to retain her home, defendants may not incur any losses and they will effectively come

out ahead than it would have had it permitted the foreclosure to proceed.

### D. Injunction is in the Public Interest

It is in the public interest to avoid displacement and homelessness when borrowers are

unable to make payments to the lender due to circumstances beyond their control. A temporary

4

restraining or preliminary injunction order pending resolution of this case would prevent the loss of Ms. Darcy's home, her displacement and potential homelessness. An injunction would, therefore, be in the public interest.

## II. The Bond Requirement Should be Waived

Rule 65(c) provides that the "court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). However, the courts have not required a security in light of the movant's financial inability to pay and the likelihood of success. *See Guillermety v. Secretary of Educ.,* 241 F.Supp.2d. 727, 759 (E.D. Mich. 2002)(finding that the posting of security was necessary given plaintiff's strong likelihood of success and his financial inability to pay a bond); *Sluiter v Blue Cross and Blue Shield,* 979 F.Supp. 1131, 1145 (E.D. Mich. 1997)(same). The courts have also held that no bond is required based on a strong public interest. *See Cheatham v Donovan,* 2009 WL 2922150 *11 (E.D. Mich. 2009)("Because of the strong public interest involved in this litigation, no bond is required."). As Ms. Darcy has shown in the verified amended complaint, her financial circumstances demonstrate an inability to pay the bond. Further as there is a likelihood of success in this case and an injunction would be in the public interest, the bond requirement should be waived in this case.

## CONCLUSION

Based on the foregoing, Ms. Darcy respectfully asks that this Court issue a Temporary Restraining Order and Preliminary Injunction that would stop the foreclosure sale, assist her in overcoming her current hardship, retain her home for herself and her family, and avoid homelessness.

Respectfully submitted,


s/Lorray S.C. Brown_____                    Dated: February 7, 2011
MICHIGAN POVERTY LAW PROGRAM
By: Lorray S.C. Brown (P60753)
Attorney for Plaintiff
 220 East Huron Street, Suite 600A
Ann Arbor, Michigan 48104
(734) 998-6100, ext 113
lorrayb@lsscm.org


s/Kellie Makie_____                    Dated: February 7, 2011
LEGAL SERVICES OF SOUTH CENTRAL
MICHIGAN
By:  Kellie Maki (P70357)
Attorney for Plaintiff
3490 Belle Chase Way, Suite 50
Lansing, Michigan 489112
(517) 394-2985
kamaki@lsscm.org

<u>CERTIFICATE OF SERVICE</u>

I certify that on February 7, 2011, I electronically filed the foregoing Motion for

Temporary Restraining Order and Preliminary Injunction and Brief in Support of the Motion

with the Clerk of the Court using the ECF system which will send notification of such filing to

the following:

Kellie Maki
kamaki@lsscm.org

Lorray S.C. Brown
lorrayb@lsscm.org

Richard Welke
rwelke@trottlaw.com

Respectfully submitted,

s/Lorray S.C. Brown
MICHIGAN POVERTY LAW PROGRAM
By: Lorray S.C. Brown (P60753)
Co-counsel for Plaintiff
220 East Huron Street, Suite 600A
Ann Arbor, Michigan 48104
(734) 998-6100, ext 113
lorrayb@lsscm.org

Dated: February 7, 2011